# EXHIBIT 1

Home | Contact Us | Email this Page | FOIA | Privacy Notice | Archive | Español | Search

About the State Dept. | Press and Public Affairs | Travel and Living Abroad | Countries and Regions | International Issues | History, Education and Culture | Business Center | Other Services | Employment

Bureau of Democracy, Human Rights, and Labor > Releases > Human Rights > 2004 > Near East and North Africa

# Yemen

Country Reports on Human Rights Practices  - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

Yemen is a republic with an active bicameral legislature composed of an elected 301-seat House of Representatives (Majlis Al-Nuwaab) and an appointed 111-member Consultative Council (Majlis Al-Shura). President Ali Abdullah Saleh is the leader of the ruling party, the General People's Congress (GPC), which dominates the Government. The Constitution provides that the President be elected by popular vote from among at least two candidates endorsed by Parliament. In 1999, President Saleh was directly elected in a popular vote to another 5-year term, amended in a 2001 referendum to a 7-year term. A competitive candidate did not oppose the President because his sole opponent was a member of the ruling GPC. In April 2003 parliamentary elections, the GPC maintained an absolute majority. International observers judged elections to be generally free and fair, although there were problems with underage voting, confiscation of ballot boxes, voter intimidation, and election-related violence. The Parliament was not an effective counterweight to executive authority, although it increasingly demonstrated independence from the Government. The head of the leading opposition party, Islah, led the elected House of Representatives, which effectively blocked some legislation favored by the Executive. Effective political power rested with the executive branch, particularly the President. The Constitution provides for an "autonomous" judiciary and independent judges; however, the judiciary was weak, and corruption and executive branch interference severely hampered its independence.

The primary state security and intelligence gathering apparatus is the Political Security Organization (PSO), which reports directly to the President. In 2002, the government formed a new organization, the National Security Bureau (NSB), which also reports directly to the President's office. The NSB is still carving out its responsibilities, many of which appear to overlap with the PSO; however, its duties were not clearly delineated at year's end. The Criminal Investigative Department (CID) of the police reports to the Ministry of Interior and conducts most criminal investigations and arrests. The Central Security Organization (CSO), also a part of the Ministry of Interior, maintains a paramilitary force. Civilian authorities generally maintained effective control of the security forces. Members of the PSO and MOI police forces committed serious human rights abuses, including police beatings, arbitrary arrests, and detentions without charge.

The country had a population of approximately 20 million; more than 40 percent of the population lived in poverty, and the estimated unemployment rate was 37 percent. The country's illiteracy rate was 50 percent, with 67.5 percent illiteracy among women. The country's market-based economy remained impeded by government interference and corruption. The economy was mixed with a GDP growth rate of 2.8 percent. Oil and remittances from workers in other Arabian Peninsula states were the primary sources of foreign exchange. Foreign aid was an important source of income.

The Government's human rights record remained poor, and the Government continued to commit numerous abuses. There were limitations on citizens' ability to change their government. Security forces arbitrarily continued to arrest, detain, and torture persons. In many cases, the Government failed to hold members of the security forces accountable for abuses, although the number of officials in the PSO and MOI police forces tried for abuses increased for a second consecutive year. Prison conditions remained poor, although the Government took some steps to alleviate the situation. Despite constitutional constraints, PSO and MOI police officers routinely monitored citizens' activities, searched their homes, detained citizens for questioning, and mistreated detainees. Prolonged pretrial detention, judicial corruption, and executive interference undermined due process. During the year, there was a marked increase in limits on freedom of speech and of the press. The Government increased its harassment of journalists. The Government imposed some limits on freedom of movement.

Violence and discrimination against women remained problems. There was some discrimination against persons with disabilities and against religious, racial, and ethnic minorities. Child labor remained a common problem. The Government imposed restrictions on labor unions.

**RESPECT FOR HUMAN RIGHTS**

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no politically motivated killings by the Government or its agents; however, there were a few reports that security forces killed or injured persons whom they were apprehending, and believed were engaging in criminal activity, or were resisting arrest.

In June, the Government used military force against an armed rebellion in the northern governorate of Saada. The rebellion was led by Shi'ite cleric Hussein Badr Eddine Al-Houthi, founder of the "Shabab al-Moumineen" (The Believing Youth). Numerous cease-fires and mediation attempts failed to end the conflict. On September 10, the Government announced that Al-Houthi had been killed in combat. The Government prevented the media from fully conveying the extent of casualties on both sides, as well as the collateral damage. Estimates of civilian deaths ranged from 500 to 1,000, according to Amnesty International (AI).Opposition media and political leaders claimed the Government used excessive force in suppressing the rebellion. Some Al-Houthi supporters captured during the conflict remained in detention at year's end (see Section 1.d).

In April 2003, election-related violence resulted in three documented deaths (see Section 3). There were no reports of arrests in relation to this violence.

Tribal violence resulted in a number of killings and other abuses, and the Government's ability to control tribal elements remained limited (see Section 5). In several cases, long-standing tribal disputes were resolved through government-supported mediation by nongovernmental actors (see Section 4). Fatal shootings and violence continued during the year. In most cases, it was impossible to determine the perpetrator or the motive, and there were no claims of responsibility. Although a few may have had criminal, religious, or political motives, most appeared to be cases of tribal revenge or land disputes.

On July 7, the trial of six suspects in the 2000 bombing of the USS Cole began, and observers judged it to be fair (see Section 1.e.). Two defendants received death sentences, while the other four received prison terms ranging from 5 to 10 years.

b. Disappearance

There were no reports of politically motivated disappearances.

Unlike in the past, during the year, there was only one incident in which a tribe used kidnapping to bring their political and economic concerns to the attention of the Government. The kidnappers demanded jobs for fellow tribesman; all three foreigners were released in August after several hours. There were no arrests or punishments. There were several known instances of carjacking during the year, most perpetrated by economically motivated tribal elements.

c. Torture and other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution prohibits such practices; however, there were reports that members of the PSO and MOI police forces tortured and abused persons in detention. There were also reports that authorities used force during interrogations, especially against those arrested for violent crimes.

The Government acknowledged publicly that torture occurred; however, it claimed that torture was not official policy. Most observers reported that both the instances and severity of torture in PSO and Ministry of the Interior prisons have declined; however, there were reports the PSO increased its use of nonphysical indicator abuse such as sleep deprivation, cold water, and threats of sexual assaults. There were reports that the CID routinely used torture in order to obtain confessions.

Illiteracy, lack of training among police, PSO and MOI forces, corruption, and pressure from superiors to produce convictions also played a role in the undue use of force. The immunity of all public employees from prosecution for crimes allegedly committed while on duty hindered accountability. The Government has taken some effective steps to end torture and to punish those who commit such abuses. In 1998, the use of leg irons and shackles in confinement was outlawed. This was adhered to in most MOI-run prisons in the past year.

During the year, approximately 54 police officials were disciplined or tried for abuses. All received sentences ranging from 20 days to more than 10 years imprisonment for physical attacks during investigations, shootings, accidental and intentional killings, fraud, and extortion. Seven members of the police force in Taiz were undergoing trial for the severe torture of a juvenile murder suspect in 2002. The case was suspended in October after the defendants failed to appear for court. At year's end, the defendants remained at large, and there was further action in the case.

The Constitution may be interpreted as permitting amputations, in accordance with Shari'a (Islamic law), and physical punishment such as flogging for some crimes. There were no reports of amputations or floggings during the year.

Tribal violence continued to be a problem during the year, causing numerous deaths and injuries (see Section 5).

Prison conditions were poor and did not meet internationally recognized standards, and the Government permitted limited visits by independent human rights observers. The Government allowed limited access to detention facilities by parliamentarians and some nongovernmental organizations (NGOs).

Prisons were extremely overcrowded, sanitary conditions were poor, and food and health care were inadequate to nonexistent. Prison authorities often exacted bribes from prisoners to obtain privileges, or refused to release prisoners who completed their sentences until family members paid a bribe. In some cases, authorities arrested without charge and held refugees, persons with mental disabilities, and illegal immigrants in prisons with common criminals.

Women were held separately from men, and conditions were equally poor in women's prisons. By custom, young children and babies born in prison were likely to be incarcerated along with their mothers. At times, male police and prison officials subjected female prisoners to sexual harassment and violent interrogation. Local tradition requires male relatives of female prisoners to arrange their release; however, female prisoners regularly were held in jail past the expiration of their sentences because their male relatives refused to authorize their release due to the shame associated with their alleged behavior. Security and political prisoners generally were also held in separate facilities operated by the PSO.

Children were held in separate facilities from adults. Pretrial detainees were also held in separate facilities in major urban areas.

Unauthorized "private" prisons, in rural areas controlled by tribes, remained a problem. Tribal leaders misused the prison system by placing "problem" tribesmen in "private" jails, either to punish them for noncriminal indiscretions or to protect them from retaliation. At times, such prisons were simply rooms in a tribal sheikh's house. Persons detained in such prisons often were held for strictly personal or tribal reasons, and without trial or sentencing. Although senior officials did not sanction these prisons, there were credible reports of the existence of private prisons in government installations. During the year, modest efforts by the Ministry of Interior and Ministry of Human Rights continued to implement directives intended to align the country's arrest, interrogation, and detention procedures more closely with international standards.

Persons with mental illness who had committed crimes were imprisoned in conditions without adequate medical care. In some instances, authorities arrested without charge persons with mental illness and placed them in prisons with criminals. In August, the Government acknowledged this problem to the International Committee of the Red Cross (ICRC), and committed to rectify the situation. There was no further action made by the Government by year's end.

In July 2003, the President declared the release of mentally disturbed prisoners into the custody of mental institutions. Despite the national Red Crescent's attempt to build and staff adequate and separate detention facilities for prisoners with mental illness, there were not enough mental institutions at year's end.

Access to detainees held by the PSO was limited. Requests for access by parliamentarians were routinely denied. In June, the ICRC suspended a second round of visitations citing a lack of understanding of its universally applied procedures. The ICRC was still working on understandings of protocols for access to PSO prisons at year's end. The ICRC reported that after an October 30 meeting, the Ministry of Interior demonstrated a clearer understanding of its protocols that allowed for greater access to the Ministry's prisons.

d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention; however, the Government generally did not observe these prohibitions. Enforcement of the law was irregular and in some cases nonexistent, particularly in cases involving security offenses. The CID reports to the Ministry of Interior and conducts most criminal investigations and arrests. The CSO, also a part of the Ministry of Interior, maintains a paramilitary force. Corruption was a problem. There was no official government response to or investigations of police corruption during the year.

There were reports that some police stations maintained an "Internal Affairs" section commissioned to investigate abuses, and that any citizen has the right to raise an abuse case with the Prosecutor's office commissioned to investigate cases. Enforcement of the law and effective investigations were irregular due to weak government power in tribal areas and lack of resources. Fifty-four police officials were prosecuted for abuses (see Section 1.c.).

According to the law, individuals cannot be arrested, unless caught in the act or served with a summons. Detainees must be arraigned within 24 hours of arrest or be released. The judge or prosecuting attorney must inform the accused of the basis for the arrest and decide whether detention is required. The law stipulates that a detainee may not be held longer than 7 days without a court order. Despite these constitutional and other legal provisions, arbitrary arrest and prolonged detention without charge remained common practices.

The law prohibits incommunicado detentions and provides detainees with the right to inform their families of their arrests, and to decline answering questions without an attorney present. The Government must provide attorneys for indigent detainees; however, in practice, this did not always occur. Almost all rural cases are settled out of court with tribal mediators. There are provisions for bail; however, many authorities abided by these provisions only if bribed.

There were reports that an unknown number of supporters of the rebel Shi'ite cleric Al-Houthi remained in detention. According to Amnesty International (AI), security forces conducted mass arrests in Sa'da Province, as a result of the June conflict. AI reported that those arrested have been detained incommunicado. There were no trials held by year's end.

Citizens regularly claimed that security officials did not observe due process procedures when arresting and detaining suspects. There were also claims that private individuals hired lower-level security officials to intervene on their behalf and harass their business rivals. Security forces at times detained demonstrators (see Section 2.b.). Members of security forces continued to arrest and detain citizens for varying periods of time without charge or notification to their families. Detainees were often unaware of which agency was investigating them, and the agencies themselves frequently complicated the situation by unofficially transferring custodial authority of individuals. In some cases where a criminal suspect was at large, security forces detained a relative while the suspect was being sought (see Section 1.f.).

The Government failed to ensure that detainees and prisoners were incarcerated only in authorized detention facilities. The Ministry of Interior and the PSO operated extrajudicial detention facilities. Unauthorized private prisons also existed (see Section 1.c.).

A large percentage of the total prison population consisted of pretrial detainees, some of whom have been imprisoned for years without charge.

Some government inspection missions and local human rights groups helped secure the release of a few persons held without charge; however, in some instances, the Government did not investigate or resolve these cases adequately.

Throughout the year, the Government sponsored ideological dialogues, led by Islamic scholars, to attempt to release detainees in exchange for repentance of past extremism, denunciation of terrorism, commitments to obey the laws and Government, respect non-Muslims, and refrain from attacking foreign interests. Such efforts had limited success.

During the year, the Government continued to detain suspects, accused of links to terrorism. The Government did not publish numbers of detainees held under suspicion of terrorist affiliations or activities; however, estimates ranged between 200 and 400 individuals.

In November, the President released approximately 120 security detainees in honor of Ramadan. The prisoners were released for good behavior and had either completed or nearly completed sentences. All participated in the ideological dialogues.

e. Denial of Fair Public Trial

The Constitution provides for an "autonomous" judiciary and independent judges; however, the judiciary was weak and severely hampered by corruption and executive branch interference. The executive branch appoints judges, removable at the executive's discretion. There were reports that some judges were harassed, reassigned, or removed from office following rulings against the Government. Many litigants maintained, and the Government acknowledged, that a judge's social ties and occasional bribery influenced the verdict more than the law or the facts.

On December 22, President Saleh announced new directives to bring about judicial reform and the Supreme Judicial Council (SJC), an executive branch council tasked with managing the judiciary, dismissed 22 judges for corruption. The SJC also designated 8 judges for investigation of "alleged violations committed in the course of their work", and forced 108 judges into retirement. Many judges were poorly trained; some, closely associated with the Government, often rendered decisions favorable to it. The judiciary was hampered further by the Government's frequent reluctance to enforce judgments. Tribal members at times threatened and harassed members of the judiciary.

There are five types of courts: criminal; civil and personal status (covering cases such as kidnapping, carjacking, attacking oil pipelines, and other acts of banditry and sabotage); commercial; and court-martial. In recent years, other limited jurisdiction courts have been established under executive authority such as a juvenile and public funds court. The judicial system is organized in a three-tiered court structure. At the base are the Courts of First Instance, which are broadly empowered to hear all manner of civil, criminal, commercial, and family matters. A single judge may hear a case in these courts. Decision taken in the Courts of First Instance may be appealed to the Courts of Appeal, of which there is one in each province and one in the capital. Each Court of Appeal includes separate divisions for criminal, military, civil, and family issues. Each division is composed of three judges. Above the Court of Appeals is the Supreme Court.

The Supreme Court, the highest court, is empowered to settle jurisdictional disputes between different courts, hear cases brought against high government officials, and serve as the final court of appeal for all lower court decisions. The Supreme Court has eight separate divisions: constitutional (composed of seven judges including the Chief Justice); appeals' scrutiny; criminal; military; civil; family; commercial; and administrative. The Supreme Court has special panels empowered with determining the constitutionality of laws and regulations.

In addition to the regular hierarchy of courts, there are courts for military, juvenile, tax, customs, and labor matters, whose decisions may be appealed to the Courts of Appeal.

All laws are based on a mixture of old Egyptian laws, Napoleonic tradition, and Shari'a. There are no jury trials. Judges, who play an active role in questioning witnesses and the accused, adjudicate criminal cases. By law, the Government must provide attorneys for indigent defendants in high crime (felony) cases; however, in practice, this did not always occur. By law, prosecutors are a part of the judiciary and independent of the Government; however, prosecutors also have a role in investigating criminal cases. The police are generally weak and play a limited role in developing cases.

The accused are considered innocent until proven guilty. Defense attorneys are allowed to counsel their clients, address the court, and examine witnesses and any relevant evidence. All defendants, including women and minorities, have the right to appeal their sentences. Trials were generally public; however, all courts may conduct closed sessions "for reasons of public security or morals". Foreign litigants in commercial disputes complained of biased rulings.

In addition to regular courts, there is a system of tribal adjudication for noncriminal issues; however, in practice, tribal "judges" often adjudicate criminal cases as well. The results carry the same if not greater weight as court judgments. Persons jailed under the tribal system usually are not charged formally with a crime, but stand publicly accused of their transgression.

A special court exists to try persons charged with kidnapping, carjacking, attacking oil pipelines, and other acts considered to be of "public danger" such as banditry and sabotage (see Section 1.b.). This court provides the defendants with the same rights provided in the regular courts. It is more efficient and takes better care to enforce those rights than regular courts. There are no military or security tribunals that try civilians.

The Government continued modest judicial reform efforts. During the year, the Ministry of Justice conducted conferences around the country to strengthen the reform process. Some improvements included an increase in judges' salaries, an increase in the Ministry's budget, participation of judges in workshops, and study tours conducted by foreign judicial officials.

There were no reports of prosecutors being dismissed for violating the law. The security services continued to arrest, charge, and submit cases to the prosecutor's office to try persons alleged to be linked to various shootings, explosions, and other acts of violence. Citizens and human rights groups alleged that the security forces and judiciary did not observe due process in most cases.

On May 29, the trial began of 15 suspects accused of Al-Qa'ida connections and involvement in 5 terrorist incidents including a plot to assassinate a foreign ambassador and attack foreign embassies. Defendants claimed that they were not allowed full access to the prosecution's evidence. Observers concluded that the trial was conducted according to the law and was generally fair. Sentences ranged from death in one case to 5 to 10 years for others. The Appeals court heard arguments of all the defendants in the case, but no decisions were rendered by year's end.

On July 7, the Government opened its case against six suspects in the 2000 bombing of the USS Cole in Aden. Despite defense claims to the

contrary, observers evaluated the conduct of the trial as generally fair. At year's end, defendants in the case had submitted their cases to the Appeals court, which did not render a decision.

The Government continued to maintain that Abdulkarim Al-Khaiwani was not a political prisoner since he was convicted lawfully in September for violations of the press law and treason (see Section 2.a.). The Government has allowed limited access to him by various NGO groups. Several hundred armed supporters of the Al-Houthi rebellion were captured and imprisoned during and shortly after the fighting in Saada. Most were released after participation in the ideological dialogues led by Islamic scholars (see Section 1.d.). On October 10, Judge Mohammed Luqman was sentenced to ten years in prison for sedition and fanning sectarian discord. Luqman had publicly opposed the Government's action in Saada against cleric Hussein al-Houthi (see Section 2.a.).

f. Arbitrary Interference with Privacy, Family, Home or Correspondence

The Constitution prohibits interference with privacy; however, PSO and MOI police forces routinely searched homes and private offices, monitored telephones, read personal mail, and otherwise intruded into personal matters for alleged security reasons. Such activities were conducted without legally issued warrants or judicial supervision. PSO and MOI police forces sometimes detained relatives of suspects while the suspect was being sought (see Section 1.d.). Government informers monitored meetings and assemblies (see Section 2.b.).

The Government blocked some sexually explicit websites and some politically oriented sites (see Section 2.a.). The Government claimed that it did not monitor Internet usage; however, security authorities in the PSO reportedly read private e-mail messages.

The law prohibits arrests or the serving of a subpoena between the hours of sundown and dawn; however, there were reports, in some instances, that persons suspected of crimes were taken from their homes without warrants in the middle of the night. In some cases where a criminal suspect was at large, security forces detained a relative while the suspect was being sought. Detention of the family member continued while the concerned families negotiated compensation for the alleged wrongdoing. Arbitration and mediation by families, tribesmen, and other nongovernmental interlocutors was commonly used to settle such cases.

No citizen may marry a foreigner without permission from the Ministry of Interior (see Section 5). This regulation does not carry the force of law, and appears to be enforced irregularly.

g. Use of Excessive Force and Violations of Humanitarian Law in Internal and External Conflicts

The 10-week Saada rebellion ended on September 10, following the death of the rebel cleric, Badr Eddine Al-Houthi. According to media estimates, more than 600 persons were killed; however, the actual number of civilians killed was unknown. There were reports that rebel prisoners were held in incommunicado detention (see Section 1.d.).

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and of the press "within the limits of the law"; however, the Government did not respect these rights in practice. The country's security apparatus, including the newly formed NSB, often threatened and harassed journalists to influence press coverage. Although most citizens were uninhibited in their private discussions of domestic and foreign policies, they generally were cautious in public, fearing harassment for criticism of the Government. The 1990 Press and Publication Law criminalizes "the criticism of the person of the head of state... [that] does not necessarily apply to constructive criticism," the publication of "false information" that may spread "chaos and confusion in the country," and "false stories intended to damage Arab and friendly countries or their relations" with the country.

The Ministry of Information influenced the media through its control of printing presses, subsidies to certain newspapers, and its ownership of the country's sole television and radio outlets. Few newspapers owned their own presses. There are 6 government-controlled, 19 independent, and 14 party affiliated newspapers. There are approximately 80 magazines of which 50 percent are private, 30 percent are government-controlled, and 20 percent are party affiliated. The Government selected the items to be covered in news broadcasts, and it often did not permit broadcasts critical of the Government. The Government televised parliamentary debates, but edited them selectively to remove criticism.

Press Law regulations specify that newspapers and magazines must apply annually to the Government for licensing renewal, and that they must show continuing evidence of approximately $4,375 (700,000 riyals) in operating capital. There were no reports of denied registrations; however, there were reports that the Government revoked the license of one newspaper and closed down the operations of a magazine. The Government closed one newspaper for allegedly not adhering to a registration deadline. On November 6, the Government informed several press sources that no new press licenses would be issued for an unknown period of time.

In June, the President publicly declared an end to the practice of detaining journalists; however, in practice, detention of journalists continued. During the year, the Government increased pressure on independent and political party newspapers. Newspaper journalists also reported several instances of government harassment including threatening phone calls to them and their families, attacks on their homes, brief imprisonments, and personal surveillance. Journalists practiced self-censorship due to fear of government reprisal. The Government also announced that legal proceedings would be taken against anyone who supported the rebel cleric Al-Houthi once an extensive investigation on the rebellion was completed. The investigation was ongoing at year's end.

Journalists were tried and sentenced for writing articles critical of the President or reporting on issues sensitive to the regime. On April 14, a prominent journalist was arrested for writing a report about an alleged assassination attempt on the President's son, and sentenced to a fine and a 6-month work ban. On May 17, three journalists received prison sentences from 3 to 5 months, although sentences were held in abeyance pending appeals. There was no further action on the appeal at year's end.

On June 2, the Government closed the Al-Shmuu newspaper for three months, and imposed a fine of $270 (50,000 riyals) for publishing a list of banks that owed money to the Central Bank. The editor received a 1-year prison sentence, held in abeyance pending appeal. There was no further action on the appeal at year's end.

On September 5, the Government closed the As-Shura newspaper for six months. The editor, Abdulkarim Al-Khaiwani, received a 1-year prison sentence for publishing articles critical of the President's handling of the Al-Houthi rebellion, succession, and other criticisms of the Government. Despite repeated calls by several local parties, syndicates, NGOs and international groups, the Government refused to release Al-Khaiwani. Furthermore, the Government summoned and questioned seven other writers from the same paper. They were informed that they were also subject to possible prosecution. There was no appeal action by year's end.

The Yemeni Journalists Syndicate (YJS) defended freedom of the press and publicized human rights concerns. The YJS has been vocal in condemning recent government actions that closed several publications and imprisoned journalists.

Customs officials confiscated foreign publications regarded as pornographic or objectionable due to religious or political content. During the year, there were some reports that the Ministry of Information delayed the distribution of international Arabic-language dailies in an effort to decrease their sales in the country. Authorities monitored foreign publications and banned those deemed harmful to national interests.

Authors were required to obtain a permit from the Ministry of Culture to publish a book and also were required to submit copies to the Ministry. Publishers usually did not deal with an author who had not yet obtained a permit. Most books were approved, but the process was time-consuming.

The Government did not impose restrictions on Internet use; however, it blocked access to some sites (See section 1.f.).

The Government restricted academic freedom to some extent, claiming it was necessary due to politicization of university campuses. On August 23, the PSO arrested and jailed four members of the University Student Federation in the Mahaweet governorate when the opposition Islah party won a student election.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of assembly; however, in practice, the Government limited this right. The Government claimed that it banned and disrupted some demonstrations to prevent them from degenerating into riots and violence. In February, authorities forcibly removed, arrested, and incarcerated 112 Ethiopian men, women, and children who were staging a sit-in outside the U.N. High Commission for Human Rights (OHCHR) headquarters in Sana'a. The women and children, who comprised approximately half of the protesters, were released after 2 days; some of the men were incarcerated for as long as a month.

The Government required a permit for demonstrations, which it issued routinely. Government informers monitored all meetings and assemblies.

On June 6, authorities fired shots into the air to disburse a crowd of striking pilots (see Section 6.b.). On September 3 and September 6, the authorities blocked two planned protests against the Government's handling of the Al-Houthi insurgency (see Section 1.a.). On November 28, a member of the security forces shot into a crowd of protesters in front of an Aden court. One person was killed and another wounded. The protesters were monitoring the trial of a member of an intelligence agency who was accused of murder. Police claimed that the crowd was out of control. There was no further action on the incident by year's end.

The Constitution provides for the freedom of association, and the Government usually respected this right in practice. In some instances, the GPC ruling party attempted to control professional associations and NGOs by influencing internal elections (see Section 6.b.).

Associations must obtain an operating license, usually a routine matter, from the Ministry of Social Affairs or the Ministry of Culture.

The Government cooperated to some extent with NGOs, although NGOs complained that there was a lack of response to their requests for more funding. According to NGO professionals, the Government's limited responsiveness was due to a lack of material and human resources.

All political parties must be registered in accordance with the Political Parties Law, which stipulates that each party must have at least 75 founders and 2,500 members (see Section 3).

c. Freedom of Religion

The Constitution provides for freedom of religion; however, the Government limited this right in some cases. The Constitution declares that Islam is the state religion.

Followers of other religions were free to worship according to their beliefs and to wear religiously distinctive ornaments or dress; however, Shari'a forbids conversion from Islam and prohibits non-Muslims from proselytizing. The Government requires permission for the construction of all places of worship, and prohibits non-Muslims from holding elected office.

Under Islam, the conversion of a Muslim to another religion is considered apostasy, which the Government interprets as a crime punishable by death. There were no reports of cases in which the crime was charged or prosecuted by authorities.

Official policy does not prohibit or prescribe punishment for the possession of non-Islamic religious literature.

Services for Catholic, Protestant, and Ethiopian Christians were held in various locations without government interference.

Public schools provided instruction in Islam, but not in other religions; however, most non-Muslims were foreigners who attended private schools.

The Government has taken steps to prevent the politicization of mosques in an attempt to curb extremism. This included the monitoring of mosques for sermons that incited violence or other political statements considered harmful to public security. Private Islamic organizations maintained ties to pan-Islamic organizations and, in the past, have operated private schools; however, the Government monitored their activities. Through its religious ministry, the Government sponsored two events: In April, approximately 350 Imams attended training against Islamic extremism. From June 20-24, more than 270 Muslim clerics, scholars, and ministers of religious affairs from Muslim states discussed ways to promote moderate and tolerant aspects of Islam, and to disassociate from ideas of extremism and terrorism.

Following unification of North and South Yemen in 1990, owners (including religious institutions) of property expropriated by the Communist government of the former People's Democratic Republic of Yemen (PDRY) were invited to seek restitution of their property. Implementation of the process has been extremely limited, and very few properties have been returned to previous owners.

Shari'a-based law and social customs discriminated against women (see Section 5).

There were reports that citizen of religious minorities were prohibited from participating in the political process (see Section 3).

There were no reports of anti-Semitic acts against Jews or Jewish property. The country's once sizable Jewish population has largely emigrated. The Government issued a press release in June accusing Jews living in the North of backing the Al-Houthi rebellion in Saada. The Government shortly thereafter retracted the statement, which had been carried by the local media. After the ruling party tried to put forward a Jewish candidate, the General Election Committee adopted a policy barring all non-Muslims from running for Parliament (see Section 3). There were no legal restrictions on the few hundred Jews who remained, although there were traditional restrictions on places of residence and choice of employment (see Section 5).

For a more detailed discussion, see the 2004 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, Repatriation, and Exile

The Constitution provides for these rights, and the Government respected them, with some restrictions. The Government placed some limits on the freedom of movement of women, foreigners, and tourists. The two latter groups were required to obtain government permission before traveling. In practice, the Government did not obstruct domestic travel; however, the army and security forces maintained checkpoints on major roads.

In certain areas, armed tribesmen occasionally either manned their own checkpoints or operated alongside military or security officials and subjected travelers to physical harassment, bribe demands, or theft.

The Government did not routinely obstruct foreign travel or the right to emigrate and return. Although not required by law, women customarily were asked if they had permission from a male relative before applying for a passport. Immigrants and refugees traveling within the country often were required by security officials at government checkpoints to show that they possessed resident status or refugee identification cards.

The law prohibits forced exile, and the Government did not use forced exile in practice.

During the year, the Government continued to deport an unknown number of foreigners, many of whom were studying at Muslim religious schools, and believed to be in the country illegally. The Government claimed that these persons were suspected of inciting violence or engaging in criminal acts by promoting religious extremism. The Government deported them using existing laws that require all foreigners to register with the police or immigration authorities within a month of arrival in the country.

Although the law does not include provisions for the granting of refugee status or asylum to persons who meet the definition in the 1951 U.N. Convention Relating to the Status of Refugees or its 1967 Protocol, there were no reports of the forced return of persons to a country where they feared persecution. The country is party to the convention and the protocol. The Government continued to grant refugee status to Somalis who arrived in the country after 1991.

The Government cooperated with the U.N. High Commissioner for Refugees in assisting refugees and asylum seekers. At times, authorities arrested without charge and imprisoned an unknown number of undocumented refugees (see Section 1.c.).

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The Constitution provides citizens with the right to change their government; however, there were limitations in practice. By law, the Government is accountable to the Parliament; however, the Parliament is not an effective counterweight to executive authority. Decision-making and effective political power rests in the hands of the executive branch, particularly the President. In addition, the Constitution prohibits the establishment of parties that are contrary to Islam, oppose the goals of the country's revolution, or violate the country's international commitments.

The President appoints the Prime Minister, who forms the Government. The cabinet consists of 35 ministers. Parliament is elected by universal

adult suffrage. International observers judged the April 2003 parliamentary elections to be "generally free and fair"; however, there were some problems with underage voting, confiscation of ballot boxes, voter intimidation, and vote buying. In addition, international observers reported that some officials were allegedly prevented from approving results that gave victory to opposition parties. There were reports that supporters of rival candidates shot and killed at least three persons and wounded another. No arrests occurred. President Saleh's ruling GPC party maintained its large majority in Parliament. Approximately 75 percent of those eligible voted (8 million) and 43 percent of voters were women.

Ali Abdullah Saleh, the President and leader of the GPC, was elected to a 5-year term in the country's first nationwide direct presidential election in 1999, winning 96.3 percent of the vote. In 2001, the 5-year term was amended to a 7-year term. The Constitution provides that the President is elected by popular vote from at least two candidates endorsed by Parliament. Despite the fact that the President's sole opponent was a member of his own party, NGOs, foreign embassies, and U.N. Development Program (UNDP) observers found the election free and fair. The candidate selected by the leftist opposition coalition did not receive the minimum number of required votes from the GPC-dominated Parliament.

The Constitution permits Parliament to initiate legislation; however, to date it has not done so. In addition, the Government routinely consulted senior parliamentary leaders when it drafted important national legislation. Parliament debates policies that the Government submits. Although the GPC, enjoyed an absolute majority, Parliament has rejected or delayed action on major legislation introduced by the Government, and has forced significant modification. The Parliament also has criticized the Government for some actions, including the issue of detainees, corruption, and aspects of the Government's counter terrorism campaign. Ministers frequently were called to Parliament to defend actions, policies, or proposed legislation, although they sometimes refused to appear. At times, parliamentarians were sharply critical during such sessions.

There were several political parties. The GPC dominated Parliament, and Islah was the only other significant party. All parties must be registered in accordance with the Political Parties Law, which stipulates that each party must have at least 75 founders and 2,500 members. Some government opponents contended that they were unable to organize new parties because of the prohibitively high legal requirements regarding the minimum number of members and leaders. The Yemeni Socialist Party(YSP) and several smaller parties returned to active political life by participating in the 2001 local elections, constitutional referendum, and the April 2003 parliamentary election.

The law mandates that political parties should be viable national organizations, and cannot restrict their membership to a particular region. Parties based on regional, tribal, sectarian, class, professional, gender, or racial identities are not permitted. The Government provided financial support to political parties, including a small stipend to publish their own newspapers.

Corruption was a problem, particularly in the judicial branch. During the year, Parliament became more active in areas of economic reform and corruption, winning a major victory by voting to cancel a suspect oil deal arranged by the Ministry of Oil, and calling ministers to account for their actions. Parliament continued to call on the executive branch to reform the administration of government, including decentralization of finances, fighting corruption, and providing clear and transparent processes for government contracts.

Formal government authority is centralized in Sana'a; many citizens, especially in urban areas, complained about the inability of local and governorate entities to make policy or resource decisions. The Local Authority Law decentralizes authority by establishing locally elected district and governorate councils, headed by government-appointed governors. The first elections for the councils were held concurrently with the constitutional referendum in 2001. At year's end, a few local councils were still not constituted, and many continued to lack sufficient resources. In some governorates, tribal leaders exercised considerable discretion in the interpretation and enforcement of the law.

The law requires a degree of transparency and public access to information, and the Press and Publications Law provides journalists with some access to government reports and information; however, in practice, the Government offers few procedures to ensure transparency, open bidding, or effective competition in awarding government contracts. Detailed accounting of expenditures rarely occurs in a timely fashion. The Government provided limited information on websites; however, most citizens did not have access to the Internet.

Although women voted and held office, cultural norms rooted in religious interpretation often limited their exercise of these rights, and the number of women in government and politics did not correspond to their percentage of the population (see Section 5). An increasing number of women held senior leadership positions in the Government.

During the year, a group of women from the major parties secured agreement from the Supreme Committee for Elections and Referenda (SCER) to establish a Women's Department within the SCER.

Many Akhdam, a small ethnic minority, who may be descendants of African slaves, did not participate in the political process due to socioeconomic factors. All non-Muslims are banned from running for Parliament. This policy of the General Election Committee was reached in 2001 after the ruling GPC party tried to run a Jewish candidate. There were no reports that persons with disabilities were prohibited from participating in the political process.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

The Law for Associations and Foundations regulates the formation and activities of NGOs. Domestic and international human rights groups generally investigated and published their finding on human rights cases without restriction. Government officials were somewhat cooperative and responsive to their views; however, NGOs reported there was often a lack of response to their requests. During the year, several government-sponsored initiatives, particularly those promoted by the Ministry of Human Rights, were aimed at furthering cooperation with NGOs. There were reports that a few local NGOs were not invited to participate in some of these activities.

Several human rights NGOs continued to operate throughout the year. Groups included the Human Rights Information and Training Center, the National Organization for Defending Rights and Freedoms, the Sisters Arab Forum, and the Civic Democratic Forum. Although some NGOs were supported by the Government or ruling party, others were clearly supported by opposition parties or fully independent. A few NGOs practiced self-censorship.

The Government gives AI, Human Rights Watch, the Parliament of the European Union, and the Committee to Protect Journalists access to officials, records, refugee camps, and prisons (see Section 1.c.). The ICRC maintained a resident representative to inspect prisons during the year, although access to PSO prisons was restricted.

The Ministry of Human Rights, established in 2003, attempted to raise awareness of human rights via public information campaigns, training of human rights activists, and participation in numerous conferences. Through a newly established complaint mechanism, the Ministry resolved an unknown number of human rights cases out of approximately 500 submissions, primarily through coordination and correspondence with other ministries and human rights NGOs. Observers concluded that the new system was operational and had great potential, but that it was too early to evaluate its effectiveness.

Parliament has an active committee on human rights; however, some members complained the committee did not operate independently due to personal conflicts of interest by its leadership. During the year, the committee addressed issues of prison conditions, torture, and child trafficking. The committee issued unofficial reports citing the causes of child trafficking.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The Constitution provides for equal rights and equal opportunity for all citizens; however, discrimination based on race, sex, and disability existed. Entrenched cultural attitudes often affected women's ability to enjoy equal rights.

Women

The law provides for protection against violence against women; however, the provision rarely was enforced. Although spousal abuse reportedly was common, it generally was undocumented. Violence against women and children was considered a family affair, and usually not reported to the police. Due to social norms and customs, an abused woman was expected to take her complaint to a male relative (rather than the authorities) to intercede on her behalf, or provide her sanctuary if required. A small shelter for battered women in Aden assisted victims, and telephone hotlines operated with moderate success in Aden and Sana'a.

The law prohibits rape; however, it was a problem. The punishment for rape is imprisonment up to 15 years; however, it was seldom imposed.

The press, women's rights activists, and the Ministry for Human Rights continued to investigate or report on violations of women's rights. During the year, NGOs, in conjunction with each other and the Ministry of Human Rights, sponsored several women's rights conferences dealing with issues such as violence against women, honor killings, and increasing the political representation of women.

The law prohibits female genital mutilation(FGM); however, it was practiced to a limited degree. The prevalence of the practice varied substantially by region. Government health workers and officials actively continued to discourage the practice.

Prostitution is illegal; however, it occurred. The punishment for prostitution is imprisonment of up to 3 years or a fine. In a new phenomenon, there were widespread reports of Iraqi women traveling to the country to work in the sex industry (see Section 5, Trafficking in Persons).

The Penal Code allows leniency for persons guilty of committing a "crime against honor," a violent assault or killing committed against females for perceived immodest or defiant behavior. Legal provisions regarding violence against women state that an accused man should be put to death for killing a woman. However, a husband who kills his wife and her lover may be fined or imprisoned for a term of 1 year or less.

The social custom and local interpretation of Shari'a discriminated against women. Men were permitted to take as many as four wives, although very few did so. By law, the minimum age of marriage is 15 years; however, the law was not widely enforced, and some girls married as early as age 12 (see Section 5, Children). The practice of bride-price payments was widespread, despite efforts to limit the size of such payments.

The law states that the wife must obey the husband. Husbands may divorce wives without justifying their action in court. A woman has the legal right to divorce; however, she must provide a justification, and there are a number of practical, social, and financial negative considerations.

Women who seek to travel abroad must customarily obtain permission from their husbands or fathers to receive a passport, and to travel (see Section 2.d.). Male relatives were expected to accompany women when traveling; however, enforcement of this requirement was not consistent. Some women reported that they were able to travel freely without male accompaniment.

Shari'a permits a Muslim man to marry a non-Muslim woman; however, no Muslim woman may marry a non-Muslim. Women do not have the right to confer citizenship on their foreign-born spouses; however, they may confer citizenship on children born of foreign-born fathers. The foreign wife of a male citizen must remain in the country for two years in order to obtain a residence permit.

According to a Ministry of Interior regulation, any citizen who wishes to marry a foreigner must obtain the permission of the Ministry. A woman wishing to marry a foreigner must present proof of her parents' approval to the Ministry of Interior. A foreign woman who wishes to marry a male citizen must prove to the Ministry that she is "of good conduct and behavior," and "is free from contagious disease."

The Government continued to support women's rights as exemplified by local law, and the expansion of the public role of women. The President and Government strongly encouraged women to vote and supported several NGO-sponsored conferences to increase the role of women in political life.

According to 2002 government statistics, approximately 67.5 percent of women were illiterate, compared with approximately 27.7 percent of men.

The fertility rate was 6.5 children per woman. Most women had little access to basic health care.

In general, women in the South, particularly in Aden, were better educated and had somewhat greater employment opportunities than their northern counterparts. However, since the 1994 war of secession, the number of women in government in the South has declined, due to cultural pressure from the North, as well as stagnation of the economy. According to the UNDP, female workers accounted for 19 percent of the paid labor force. In 2003, the Government amended a law to require that every public or private institution employing more than 50 female workers must provide assistance with the care of their children; however this regulation was not enforced.

The Labor Law stipulates that women are equal to men in conditions of employment and employment rights; however, female activists and NGOs reported that discrimination was a common practice in both the public and private sectors. Mechanisms to enforce equal protection were weak or nonexistent.

There were no laws prohibiting sexual harassment; however it was a problem in the workplace.

The National Women's Committee completed a report on the United Nations Beijing +10 Conference for women's rights in the country. It also completed a second phase of a review of discriminatory laws against female citizens, and began an initiative to support a quota system.

The NGO Women Rights and Social Justice specialized in influencing policy makers to counter prejudice against women. It held its third symposium titled "Women's Rights in Islam."

The Sisters Arab Forum held a regional conference on strengthening women's rights vis-à-vis the 1994 Beijing Conference. Women from across the region attended.

There were a number of NGOs working for women's advancement, including: the Social Association for Productive Families, which promoted vocational development for women; the Women and Children's Department of the Center for Future Studies, which organized seminars and published studies on women and children; the Woman and Child Development Association, focused on health education and illiteracy; the Yemeni Council for Motherhood and Childhood, which provided micro credit and vocational training to women; and the Zahara Women's Association for Welfare, which conducted voter education and grassroots education.

Children

While the Government asserted its commitment to protect children's rights, it lacked the resources necessary to ensure adequate health care, education, and welfare services for children. Malnutrition was common. According to 2003 UNDP statistics, the infant mortality rate was 71 deaths per 1,000 births. Male children received preferential treatment and had better health and survival rates.

The law provides for universal, compulsory, and free education from age 6 to 15 years; however, compulsory attendance was not enforced. Many children, especially girls, did not attend primary school. According to a 2003UNDP report, average student attendance in primary schools was 76 percent for boys and 45 percent for girls. In rural areas, 52 percent of children attended school, whereas the rate in urban areas was 81 percent.

Child marriage was common in rural areas. The law requires that a girl be 15 years of age to marry; however, it was not enforced, and marriages of girls as young as age 12 occurred (See Section 5, Women).

The law does not prohibit child abuse. Although exact figures were lacking, it was a widespread problem.

FGM was practiced on a limited scale (see Section 5, Women).

Child labor was a problem. The Child Rights Law prohibits child labor; however, the law has not been implemented and children as young as 4 years of age worked in workshops, agriculture, or as street vendors (see Section 6.d.).

Trafficking in Persons

The law prohibits trafficking in persons; however, there were credible reports of trafficking in women and children. The law, which does not differentiate between children or adult victims, allows for a prison sentence of up to 10 years for anyone convicted of trafficking in persons. During the year, one child trafficker received a 3-year prison sentence. Other laws forbid and severely punish kidnapping, sexual assault, and facilitation of prostitution. The Child Rights law mandates the protection of all children from economic and sexual exploitation.

Trafficking was a relatively new phenomenon in the country, and there were no reliable statistics available. During the year, there were reports of Iraqi women trafficked to the country for the purpose of prostitution. As the problem of sex trafficking was new, authorities were unable to provide information on the scope and methods of sex trafficking, but they suspected that many women were trafficked to the country by organized criminal syndicates. The Government took steps to address this problem by instituting a new visa requirement for Iraqi citizens traveling to the country.

Press reports claimed that children were trafficked out of the country to work as street beggars, domestic help, or as camel jockeys in oil rich Gulf States at a rate of approximately 200 children per week. The Government increased its efforts to combat child trafficking. Parliament sent numerous delegations to areas known as points of origin for child trafficking in order to investigate the problem. Authorities increased the number of arrests of alleged traffickers and prosecuted two traffickers. The Government worked with UNICEF on a study to examine and increase its understanding of the problem of trafficking in children. Government investigations revealed that extreme poverty was the primary motivation behind child trafficking and that the victims' families were almost always complicit. There were no information campaigns to raise awareness of the

problem. A lack of resources, skills, and awareness hindered government action against trafficking in persons.

Persons with Disabilities

There was discrimination against persons with mental and physical disabilities in education and employment. The Government mandated the acceptance of persons with disabilities in universities, exempted them from paying tuition, and required that schools be made more accessible to persons with disabilities; however, it was unclear to what extent these laws have been implemented. There is no national law that mandates the accessibility of buildings for persons with disabilities. Public awareness regarding the need to address the concerns of persons with disabilities appeared to be increasing.

During the year, the Handicapped Society, the Challenge Society, the Yemeni Development Foundation, Al-Saleh Social Establishment, and the Islamic World Handicap and Training Council provided assistance to persons with disabilities, including rehabilitation assistance, vocational training, cultural and sports activities, and collaborative workshops on how to address the issue of disabilities in the country. The Government's Social Fund for Development, administered by the Ministry of Social Affairs, provided limited basic services to assist persons with disabilities.

At times, authorities arrested without charge and imprisoned persons with mental disabilities (see Section 1.c.).

National/Racial/Ethnic Minorities

The Akhdam (an estimated 2 to 5 percent of the population) were considered the lowest social class. They lived in poverty and endured persistent social discrimination. The Government's Social Fund for Development also provided basic services to assist the group.

Human rights groups have reported that some immigrants of African origin had difficulty in securing Ministry of Interior permission to marry citizens (see Section 1.f.).

Tribal violence continued to be a problem during the year, and the Government's ability to control tribal elements responsible for acts of violence remained limited. Tensions over land or sovereignty in particular regions, which periodically escalated into violent confrontations, continued between the Government and a few tribes.

Section 6 Worker Rights

a. The Right of Association

The Constitution and law provide that citizens have the right to form and join unions; however, this right was restricted in practice. The Government sought to place its own personnel in positions of influence in unions and trade union federations.

The law permits trade unions to establish only if federated within the General Federation of Trade Unions of Yemen (GFWTUY), the sole national umbrella organization. The GFWTUY claimed approximately 350,000 members in 14 unions and denied any association with the Government; however, it worked closely with the Government to resolve labor disputes through negotiation.

Only the General Assembly of the GFWTUY may dissolve unions. The law provides equal labor rights for women. The law does not stipulate a minimum membership for unions or limit them to a specific enterprise or firm. Thus citizens may associate by profession or trade.

The law generally protects employees from antiunion discrimination. Employers do not have the right to dismiss an employee for union activities. Employees may appeal any disputes, including cases of antiunion discrimination, to the Ministry of Social Affairs and Labor. Employees also may take a case to the Labor Arbitration Committee, which is chaired by the Ministry of Labor, and is composed of an employer representative and a GFWTUY representative. Such cases often were disposed favorably toward workers, especially if the employer was a foreign company.

b. The Right to Organize and Bargain Collectively

The labor law applies to all workers except public servants, foreign workers, day laborers, and domestic servants. The law provides workers with the right to organize and bargain collectively. The Government permitted these activities; however, it sought to influence them by placing its own personnel inside groups and organizations. The Ministry of Labor has veto power over collective bargaining agreements, a practice criticized by the International Labor Organization (ILO). Several such agreements existed. Agreements may be invalidated if they are "likely to cause a breach of security or to damage the economic interests of the country." Unions may negotiate wage settlements for their members, and may resort to strikes or other actions to achieve their demands. Public sector employees must take their grievances to court.

In some instances, the GPC ruling party attempted to control professional associations and NGOs by influencing internal elections (see Section 2.a.). In April, the Medical Association of Sana'a elected a chairman associated with the opposition Islah party, the Government refused to accept the results of the election and formed an alternative medical association.

The labor law provides for the right to strike only if prior attempts at negotiation and arbitration fail. The proposal to strike must be submitted to at least 60 percent of all concerned workers, of whom 25 percent must vote in favor. Permission to strike also must be obtained from the GFWTUY. Strikes for explicit "political purposes" were prohibited.

On June 6, police fired into the air to disburse a crowd of national airline pilots, who were striking for higher wages; no injuries were reported. There were some peaceful strikes during the year.

There were reports that private sector employers discriminated against union members through transfers, demotions, and dismissals.

There were no export processing zones in operation.

c. Prohibition of Forced or Compulsory Labor

The Constitution prohibits forced or compulsory labor, and there were no reports that such practices occurred.

d. Prohibition of Child Labor and Minimum Age for Employment

The Child Rights Law prohibits child labor; however, it has not been effectively implemented.

The established minimum age for employment was 15 years in the private sector and 18 years in the public sector. By special permit, children between the ages of 12 and 15 years could work. The Government rarely enforced these provisions, especially in rural and remote areas. The Government also did not enforce laws requiring 9 years of compulsory education for children.

Child labor was common, especially in rural areas. Many children were required to work in subsistence farming due to family poverty. Even in urban areas, children worked in stores and workshops, sold goods and begged on the streets. Many children of school age worked instead of attending school, particularly in areas in which schools were not easily accessible.

The Child Labor Unit at the Ministry of Labor was responsible for implementing and enforcing child labor laws and regulations; however, the unit's lack of resources hampered enforcement.

The Ministry of Labor estimated that there are close to half a million working children, ages 6 to 14 year, and that working children equaled 10 to 15 percent of the total work force. The Government was an active partner with the ILO's International Program to Eliminate Child Labor. During the year, this program offered remedial education, vocational training, counseling, and reintegration of child laborers into schools. In September, the Government entered into a grant agreement with a foreign government aimed at combating the worst forms of child labor in the country.

e. Acceptable Conditions of Work

There was no established minimum wage for any type of employment. The labor law provides equal wages for workers and civil servants. Private sector workers, especially skilled technicians, earned a far higher wage. The average daily wage did not provide a decent standard of living for a worker and family. The minimum civil service wage during the year did not meet the country's poverty level.

The law specifies a maximum 48-hour workweek with a maximum 8-hour workday; however, many workshops and stores operated 10- to 12-hour shifts without penalty. The 35-hour workweek for government employees was 7 hours per day from Saturday through Wednesday.

The Ministry of Labor is responsible for regulating workplace health and safety conditions. The requisite legislation for regulating occupational health is contained in the labor law; however, enforcement was weak to nonexistent. Many workers regularly were exposed to toxic industrial products and developed respiratory illnesses. Some foreign-owned companies and major manufacturers implemented higher health, safety, and environmental standards than the Government required. Workers have the right to remove themselves from dangerous work situations and may challenge dismissals in court. These laws were generally respected in practice.

This site is managed by the Bureau of Public Affairs, U.S. Department of State.
External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.
**Copyright Information** | **Disclaimers**