**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BOUMEDIENE v. BUSH | Civil Case No. 04-1166 (RJL) |
| SLITI v. BUSH | Civil Case No. 05-0429 (RJL) |
| KABIR v. BUSH | Civil Case No. 05-0431 (RJL) |
| MAMMAR v. BUSH | Civil Case No. 05-0573 (RJL) |
| AL-KHAIY v. BUSH | Civil Case No. 05-1239 (RJL) |
| AL GINCO v. BUSH | Civil Case No. 05-1310 (RJL) |
| AL BIHANI v. BUSH | Civil Case No. 05-1312 (RJL) |
| GHAZY v. BUSH | Civil Case No. 05-2223 (RJL) |
| RUMI v. BUSH | Civil Case No. 06-0619 (RJL) |
| OBAYDULLAH v. BUSH | Civil Case No. 08-1173 (RJL) |

**PETITIONERS' JOINT REPLY MEMORANDUM
REGARDING HABEAS PROCEDURES**

Petitioners respectfully submit this reply memorandum pursuant to the Court's order dated July 30, 2008, and in response to the Government's Brief Regarding Preliminary and Procedural Framework Issues filed August 12, 2008 (Gov't Br.).

## I.    THE GOVERNMENT'S PROPOSALS REST ON SEVERAL THRESHOLD ERRORS

In our opening memorandum, Petitioners demonstrated that many of the procedural issues in these cases—notably the need and scope of discovery and the parameters for an evidentiary hearing—would depend on the specific allegations made in the Government's final factual returns in each case, none of which has been filed (or amended) as yet.  In its own brief, the Government generally accepts that the Court may consider specific procedural issues on a case-by-case basis.  *See, e.g.*, Gov't Br. 14 ("The precise application of these principles may vary in certain cases.").[1]

The Government's principal positions, however, rest in large part on three critical errors, many of which misread or completely ignore the Supreme Court's decision in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008).

### A.    The Habeas Statute Governs These Cases

Despite the Government's repeated protestations (Br. 4, 5, 7-8, 10, 18-21, 32, 36, 45), this Court's authority to conduct habeas proceedings derives from 28 U.S.C. §§ 2241 *et seq.* and is not limited to the minimum required under the Suspension Clause of the Constitution.  These cases were filed as, and remain, statutory cases.  *See Khalid v. Bush*, 355 F. Supp. 2d 311, 323 n.15 (D.D.C. 2005) (Leon, J.) ("The habeas statute enumerates a very specific process that the court and parties must follow, which has several distinct and discernable steps.  *See* 28 U.S.C.

---

[1] At a hearing in the *Boumediene* case on August 13, 2008, the Government itself urged that the Court wait to see the proposed amended returns before addressing any targeted discovery requests.

§§ 2241-2255." (emphasis added)).  Only one provision of the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600, 2635 (MCA), purported to alter the normal operation of section 2241, namely section 7.  That provision is invalid (*see Boumediene*, 128 S. Ct. at 2275), and the Supreme Court expressly stated that, following that invalidation, section 2241 "would govern" (*id.* at 2266).

The Government's claim that "the only appropriate procedures are those required by the Constitution itself" (Br. 8) is not supported by any statement in *Boumediene* and is flatly contradicted by the Supreme Court's analysis.  The Government states that the MCA "repealed" section 2241 (*id.* 7), without even discussing *Boumediene*'s invalidation of that repeal.  Now that the MCA's repeal is void, Congress's presumed intent—given the absence of any subsequent enactment or "saving clause" (*Boumediene*, 128 S. Ct. at 2265)—is that the well-worn procedures of 28 U.S.C. §§ 2241 *et seq.* retain their tried-and-true applicability.[2]

**B.    The Government Has Not Shown That Standard Factfinding Procedures Would Impose Any Actual Undue Burden**

As it did before Judge Hogan, the Government advances broad-brush claims that adopting standard factfinding procedures in these cases would have catastrophic consequences for the Nation.  The Government's suggestions are entirely hypothetical and untethered to the facts of any case before this Court.  The Government's inability to show an actual burden is

---

[2] The Government misreads Justice Souter's statement in concurrence that "now there must be constitutionally based *jurisdiction* or none at all" (*Boumediene*, 128 S. Ct. at 2278 (emphasis added)) to suggest that a reference to *jurisdiction* somehow alters the statutory *procedures* applicable here.  The Government's argument is meritless.  The Suspension Clause did indeed require that there be "jurisdiction" in these cases, which led to the conclusion that MCA § 7 (which expressly barred jurisdiction) was invalid and that section 2241 (which confers jurisdiction) was restored.  But neither the Court nor Justice Souter suggested that, following the reinstatement of jurisdiction, habeas procedures were *limited* to those protected under the Suspension Clause.  A turn of phrase regarding the Constitution's effect on "jurisdiction" cannot, without more, rewrite the statutory procedures enacted by Congress in section 2241 *et seq.*

demonstrated most forcefully by its repeated invocation of the "battlefield." *See, e.g.*, Gov't Br. 5, 35, 39, 42.  The Government tellingly ignores the fact that most (and perhaps all) of these Petitioners *were never on a "battlefield."*  Moreover, after more than six years of confinement, there is no reason to think that requiring a meaningful burden of proof, discovery, and evidentiary hearing will entail that any "servicemembers" be "haul[ed] … away from the battlefield." *Id.* 35.  On the contrary, it is more likely that the Government's evidence will be based on statements by employees of civilian Government agencies, such as the FBI, CIA, and Departments of Defense, State, and Justice, such that ordinary procedures will have no influence on the conduct of war.  *See Al-Marri v. Pucciarelli*, No. 06-7427, 2008 WL 2736787, at *47 (4th Cir. July 15, 2008) (en banc) (Traxler, J., concurring in the judgment) (authorizing ordinary procedural standards, including discovery from "civilian agencies," in enemy combatant habeas case).  To the extent the Government contends otherwise, the Court should require a specific showing that ordinary procedures "would unduly burden the government" in a particular case. *Id.* at *45.

Petitioners and the Court are at a disadvantage because—despite having had over six and a half years to gather its case—the Government claims it is only now deciding what its factual allegations will be.  But Petitioners have no reason to suspect, and the Government has given no reason to believe, that it could make any good-faith allegation of participation in any "battle" against any U.S. military personnel in most of this Court's cases.  The *Boumediene* Petitioners (No. 04-CV-1166) were arrested by civilian police in Bosnia.  Mr. Al-Ginco (No. 05-CV-1310) is a former political prisoner held by the Taliban who sought out U.S. authorities for help.  This Court should not craft procedures based on abstract and unsupported "battle" scenarios.

### C.     As *Boumediene* Recognized, The *Hamdi* Plurality Opinion Does Not Decree A "Procedural Framework" For These Cases

The Government clings to its notion of a "*Hamdi* framework," as though the Supreme Court in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), had purported to lay down procedural rulings to govern all cases.  *See* Gov't Br. 7, 9-12, 14.  *Boumediene* and *Hamdi* itself refute the Government's argument.

The *Boumediene* majority opinion—authored by Justice Kennedy and joined by Justice Breyer, the only two Members of the *Hamdi* plurality still on the Supreme Court—nowhere suggests that *Hamdi* is relevant to the procedures in these cases, let alone that it solidifies habeas procedures in the way the Government contends.  *Boumediene* did not reference *Hamdi* at all when discussing the "[c]ertain accommodations [that] can be made to reduce the burden habeas corpus proceedings will place on the military without impermissibly diluting the protections of the writ."  128 S. Ct. at 2276.  The *Boumediene* Court discussed the *Hamdi* plurality's procedural statements on exactly one occasion, and then the Court went out of its way to note that those statements are *not* binding—a point undisputed by the dissenting Justices.  *See id.* at 2269 (stating that the *Hamdi* plurality's discussion of procedures "did not garner a majority of the Court"); *id.* at 2283 (Roberts, C.J., dissenting) ("[T]he process a given prisoner is entitled to receive *depends on the circumstances* and the rights of the prisoner." (emphasis added)).  *Boumediene* also held that appropriate procedures were a matter for *this Court* to decide "in the first instance" (128 S. Ct. at 2276)—a statement that would make no sense if, as the Government contends, the *Hamdi* plurality had already cemented the appropriate procedures in 2004.[3]

---

[3] The Government's continued efforts to portray the *Hamdi* plurality as "controlling" (Br. 5-7, 11, 14, 16-17, 19, 22-23, 27, 30, 32, 35, 42) fail.  When there is no Opinion of the Court, the Supreme Court's holding is "that position taken by those Members who *concurred in the judgments* on the narrowest grounds."  *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted) (emphasis added).  Only six Justices concurred in the *Hamdi*

The Government's assertion that the "procedural framework in *Hamdi* provides the necessary elements of habeas review that, according to *Boumediene*, 'accords with [the] test for procedural adequacy in the due process context'" (Br. 10) is pure misinterpretation. *Boumediene* actually said that "[t]he idea that the necessary scope of habeas review in part depends upon the rigor of any earlier proceedings accords with our test for procedural adequacy in the due process context." 128 S. Ct. at 2268. The passage discusses the fact that the protections of both habeas and due process are greater where, as here, the Petitioner has had no previous fair or adversarial hearing; it says nothing about "necessary elements of habeas review" (Gov't Br. 10) and certainly does not suggest that the Government's reading of *Hamdi* includes them. If anything, this passage makes clear that habeas procedures and due process are closely linked.[4]

---

judgment to remand the case for further habeas procedures: the four-Justice plurality and Justice Souter in concurrence (joined by Justice Ginsburg). Regarding habeas procedures, Justice Souter's concurrence was clearly the narrower opinion—expressly agreeing with the plurality on some procedural points but disagreeing on others—and therefore controls. *See* Pet. Opening Mem. 23 n.9. The Government cites no authority for its inexplicable suggestion that Justice Thomas's *dissenting* opinion in *Hamdi* could play any role in determining the Court's holding on this issue.

[4] The Government seeks to resurrect its discredited theory that the Constitution does not apply in Guantanamo habeas proceedings. Br. 11-12 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), and *Johnson v. Eisentrager*, 339 U.S. 763 (1950)). The Supreme Court has now twice rejected the Government's attempt to treat Guantanamo as analogous to Mexico or postwar Germany. *See Boumediene*, 128 S. Ct. at 2257-2262; *Rasul v. Bush*, 542 U.S. 466, 476 (2004); *id.* at 486-487 (Kennedy, J., concurring in the judgment). This Court should not entertain the argument a third time. Likewise, the fact that Petitioners are foreign nationals has no bearing on the procedural protections to which they are entitled on habeas. While Congress may distinguish between citizens and aliens in the exercise of its "power over naturalization and immigration" (*Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976) (quoted at Gov't Br. 9)), this is not an immigration case, but a habeas case challenging lifetime confinement in a prison under exclusive U.S. jurisdiction and control. The protections of habeas and due process apply in this context with undiminished force to aliens as well as to citizens. *See Boumediene*, 128 S. Ct. at 2256 (noting that "practical considerations, related not to the petitioners' citizenship but to the place of their confinement and trial" were "decisive factors" in determining the Constitution's application); Pet. Opening Mem. 5 n.1.

*Boumediene*'s recognition that *Hamdi* did not settle the habeas procedures in these cases was logical given the narrow scope of the *Hamdi* plurality opinion.  As Judge Traxler's controlling opinion for the en banc Fourth Circuit held, the *Hamdi* plurality's analysis "clearly arose from the context of a *battlefield detainee*" and was viewed as "appropriate *in light of the facts of the case*—a person initially detained abroad by our allies *on a battlefield in Afghanistan*."  *Al-Marri*, 2008 WL 2736787, at \*45 (Traxler, J., concurring in the judgment) (emphasis added).  Judge Traxler's analysis of *Hamdi* is unequivocal: "the *Hamdi* plurality neither said nor implied that normal procedures and evidentiary demands would be lessened in *every* enemy-combatant habeas case, regardless of the circumstances."  *Id.*  Thus, if a Petitioner is to "receive exactly what the *Hamdi* plurality gave to Hamdi," the Court must "weigh his rights against the *actual* government burdens to determine whether a lessening of the normal procedures is warranted."  *Id.* at \*46 n.14; *see also Hamdi*, 542 U.S. at 529 (plurality opinion) (procedural analysis must consider "the burdens the Government *would face* in providing greater process" (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976))).  Given the Government's favorable citation of Judge Traxler's analysis of *Hamdi* (Br. 9), it cannot plausibly argue that the *Hamdi* plurality decreed a single procedure to be imposed across all "enemy combatant" cases regardless of the circumstances and relative interests in each case.[5]

---

[5] Contrary to the Government's insinuation, Judge Traxler did not view *Hamdi* as governing every situation involving an "extraterritorial capture."  Gov't Br. 9 (citing *Al-Marri*, 2008 WL 2736787, at \*42 (Traxler, J., concurring in the judgment)).  Judge Traxler clearly recognized the importance to the *Hamdi* plurality of Hamdi's status as "a *battlefield detainee* captured in a foreign nation."  *Al-Marri*, 2008 WL 2736787, at \*42 (Traxler, J., concurring in the judgment) (emphasis added).  Extraterritorial capture, though possibly relevant in some circumstances, does not necessarily increase the burden on the United States to litigate a habeas case under familiar procedures, particularly if the witnesses and evidence are primarily located within the United States or at Guantanamo, which the Supreme Court held is "not abroad" in any practical sense.  *Boumediene*, 128 S. Ct. at 2261.  Indeed, the Government acknowledges elsewhere in its brief that the Government's interests in *Hamdi* were based on the situation of

The case-specific treatment of procedures in *Boumediene* and *Al-Marri* is fully consistent with the *Hamdi* plurality opinion. The plurality suggested that the district court, on remand, should craft habeas procedures in a flexible manner so as to balance the petitioner's compelling interest in meaningful review against any Government interests of "national security that *might arise* in an *individual case*." *Hamdi*, 542 U.S. at 539 (plurality opinion) (emphasis added). In *Hamdi*, the government interest was in detaining a person who had "in fact *fought with the enemy during a war*" (*id.* at 531 (plurality opinion) (emphasis added) (quoted at Gov't Br. 12))— a statement that is simply inapplicable in most if not all of these cases. The balance of interests in cases of Petitioners imprisoned in peaceful countries, whose cases depend largely on material in the hands of civilian agencies, will necessarily tip in favor of greater process than was envisioned for an actual Taliban fighter captured by soldiers during battle.[6]

## II.   RESPONSE TO THE GOVERNMENT'S INDIVIDUAL PROPOSALS

### A.   The Court Should Reject The Government's Effort To Justify Detention On Less Than Clear And Convincing Evidence

Petitioners agree with the Government that, unlike in post-conviction habeas cases, the Petitioner does not bear "the burden of showing that he was unlawfully detained"; rather, the Government must justify imprisonment. Gov't Br. 15 (quoting *Eagles v. United States ex rel. Samuels*, 329 U.S. 304, 314 (1946)). Petitioners also agree that the Government's return must contain "credible evidence" supporting detention. *Id.* 4, 13-14. Finally, although it does not even mention *Parhat v. Gates*, No. 06-1397, 2008 WL 2576977 (D.C. Cir. June 20, 2008), the

---

persons who "have in fact fought with the enemy" and the burdens that might be imposed "on the military" due to "ongoing hostilities" and "military action." Gov't Br. 12-13 (quoting *Hamdi*, 542 U.S. at 533).

[6] The Government asserts that these Petitioners were "captured under similar circumstances" to Hamdi. Gov't Br. 8. That statement is false. For instance, the Government has never alleged, nor could it, that the *Boumediene* Petitioners (No. 04-CV-1166) *ever* fought the United States on a battlefield, let alone were "captured" in such a situation.

Government appears to accept that, if the return does not provide a basis for evaluating the Government's evidence as reliable, then the writ must issue even without any further evidence from the Petitioner. Gov't Br. 4 (stating that, following the filing of the return, Petitioners "may question the sufficiency of the Government's showing"); *id.* 15 n.3 (accepting that Petitioners may "file a motion for judgment" after the filing of the return).

Beyond that, however, the Government's proposals are erroneous. Indeed, the Government appears to seek to impose the ultimate burden of persuasion on *the Petitioner* by stating that the case must be dismissed unless the Petitioner produces evidence "more persuasive" than that of the Government. Gov't Br. 14, 15. Such a requirement—that the Petitioner ultimately persuade the Court that he is *not* detainable—would turn habeas review of Executive detention on its head. The Government does not identify a single case in which a habeas court required a prisoner of the Executive, held without trial, to persuade the court of his non-detainability, rather than requiring the jailer to demonstrate the lawfulness of imprisonment. *See, e.g.*, *Boumediene*, 128 S. Ct. at 2271 (a "showing [is] required of the Government in these cases"); *Foucha v. Louisiana*, 504 U.S. 71, 81-82 (1992) (invalidating confinement scheme that "place[d] the burden on the detainee to prove that he is not dangerous").

As discussed above, the *Hamdi* plurality's suggested "burden-shifting scheme" has no application or relevance outside of a "battlefield" context, especially absent any showing of actual need for such a scheme in a particular case. A presumption in the Government's favor, and a shifting of the burden, might have made sense for an armed prisoner taken in battle who was given a hearing soon after capture, but it makes no sense for prisoners taken in the midst of civilian life who have been imprisoned for six years. *See, e.g.*, *Al-Marri*, 2008 WL 2736787, at *46 (Traxler, J., concurring in the judgment) (noting that "the risk of erroneously detaining" an

alien civilian "is much greater inside the United States than in the very different context addressed by the Supreme Court in *Hamdi*, *i.e.*, a conventional battlefield within the borders of a foreign country in which we are fighting our enemies").

Although the *Hamdi* plurality proposed that Hamdi may have needed to produce "more persuasive evidence" to respond to any "credible evidence" in the Government's return (542 U.S. at 534), the plurality did not suggest that this "scheme" would shift the *ultimate* burden to Hamdi. Rather, as with "all presumptions," the *Hamdi* plurality envisioned that the prisoner would have a shifted burden of production, not the ultimate burden of persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993); *see also* Fed. R. Evid. 301 (a presumption "does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast"). Accordingly, once both parties have produced their evidence, the burden-shifting scheme falls away, and the Court resolves any disputed issues of fact neutrally.

With respect to the standard of proof, the Government has shown no basis for applying any standard less exacting than clear and convincing evidence. As the Supreme Court has held, lower standards (such as a preponderance) are reserved for "private suits" involving "a monetary dispute between private parties." *Addington v. Texas*, 441 U.S. 418, 423 (1979). This Court would not grant attorney's fees in a patent case without making a finding by clear and convincing evidence. *See, e.g.*, *Innovation Techs., Inc. v. Splash! Med. Devices, LLC*, 528 F.3d 1348, 1351 (Fed. Cir. 2008). Lifelong imprisonment at Guantanamo should not be doled out more easily.

Petitioners' deprivation of liberty is far starker than that of other detainees who can demand proof by clear and convincing evidence. Unlike pretrial detention, Petitioners'

imprisonment has no "maximum length," nor was there a "prompt" proceeding where the Government was required to justify detention in "a full-blown adversary hearing." *United States v. Salerno*, 481 U.S. 739, 747, 751 (1987). Unlike removable aliens, whose deportability the Government must likewise prove by clear and convincing evidence, Petitioners have been deprived not of the right to live in the United States (which most of them never sought), but the right to live *anywhere* but a cramped cell on an island prison with essentially no communication with loved ones or homeland.

Petitioners' situation is for all practical purposes indistinguishable from a criminal sentence of life imprisonment, which would require proof beyond a reasonable doubt. As in a criminal case, the United States has "a substantial and fundamental interest in assuring accuracy" in these cases, not least because the "'moral force'" of U.S. law should not be "'diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned.'" *In re Ballay*, 482 F.2d 648, 663 (D.C. Cir. 1973) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Given the documented admissions of Government agents that decisions to detain were often erroneous (Pet. Opening Mem. 17), and the Government's overwhelming ability to gather and present evidence in cases of actual wrongdoing, the Court should have the highest confidence in the Government's evidence before consigning a Petitioner to unlimited confinement and isolation. There is accordingly a strong case for requiring proof beyond a reasonable doubt. *See* Pet. Opening Mem. 16-17. At the very least, however, Petitioners' claims should not be dismissed on *less* evidence than is required for pretrial detention, deportation, or civil commitment, namely clear and convincing evidence.

The Government's arguments to the contrary rest on several incorrect assumptions. First, the Executive's actions have not been "taken with the full authority of Congress" (Br. 16)—

indeed, the lack of congressional authorization for detention is one of the very issues the

Supreme Court remanded for consideration. *Boumediene*, 128 S. Ct. at 2277 (stating that "the

content of the law that governs petitioners' detention" is "a matter yet to be determined").  Nor is

it true that hearings are not "the norm" when the Government seeks to hold people for lengthy

terms.  Gov't Br. 17.  *Hamdi* itself recognized that military regulations "dictat[e] that tribunals be

made available to determine the status of enemy detainees who assert prisoner-of-war status."

542 U.S. at 538 (plurality opinion).[7]  And again, references to "service members" placing

themselves "in harm's way on a daily basis" (Gov't Br. 17) have no place in cases where

civilians are taken into custody far from any battlefield.  Accordingly, the reasons that the

Supreme Court has held require proof by clear and convincing evidence apply equally here.

  **B.**  **The Court Should Authorize Discovery As Needed In Individual Cases And Require The Government To Locate And Produce Exculpatory Evidence**

   The Government's discussion of discovery begins with a lengthy and irrelevant excursion

into the history of the common law writ.  Gov't Br. 18-22.  But the availability of discovery

before 1789 has no bearing on these statutory cases, since discovery is plainly available under

the habeas statute.  *See* 28 U.S.C. § 2246 ("[E]vidence may be taken orally or by deposition, or,

in the discretion of the judge, by affidavit."); *Harris v. Nelson*, 394 U.S. 286, 290 (1969) ("[I]n

appropriate circumstances, a district court, confronted by a petition for habeas corpus which

---

   [7] Such tribunals are convened promptly after detention and near the location of capture, maximizing the availability of witnesses and evidence. *See, e.g.*, United States Forces, Korea Reg. 190-6, § 7-2.a ("normally … within 2 days of capture"), *available at* http://www.usfk.mil /usfk/Publications/Publication_Records_Reg_USFK.htm.  Indeed, the U.S. military's first written procedures for such tribunals—developed during the Vietnam War, which was waged in significant part against non-traditional combatants—recognized a detainee's right to a "fair hearing" and the right to counsel as a "fundamental" component of such a hearing.  U.S. Military Assistance Command, Vietnam, Directive 20-5, Annex A.7, *reprinted in* 62 Am. J. Int'l L. 754, 771 (1968).  At such hearings, counsel for the detainee was allowed to present "witnesses, documents, affidavits, real evidence, and sworn or unsworn statements on behalf of the detainee." *Id.* annex A.14.i, 62 Am. J. Int'l L. at 773.

establishes a prima facie case for relief, may use or authorize the use of suitable discovery

procedures, including interrogatories, reasonably fashioned to elicit facts necessary to help the

court to 'dispose of the matter as law and justice require.'" (quoting 28 U.S.C. § 2243)).[8]

In fact, the Government appears to agree that (1) the purpose of these habeas proceedings

is to allow the Court to make a fair assessment of the legality of the detention at issue and (2)

that the production of potentially exculpatory evidence in the Government's control is an

important component of that process. *See* Gov't Br. 24 (agreeing to provide *some* potentially

exculpatory materials to Petitioners because "the Government has no interest in erroneously

holding a person"). Petitioners' proposal of limited, targeted discovery is fully consistent with

these interests, and the Government has not shown that it would impose any undue burden in any

*actual* case before the Court. To the extent that particular requests should raise a real concern,

the "prudent and incremental" course is for the Court to address them as they come, rather than

attempting to resolve in advance issues that may never arise.[9]

The Government's discussion of discovery burdens consists mainly of the Government

first assuming that Petitioners will make exaggerated demands (implicating "battlefields" and

---

[8] As a peripheral matter, the Government's constitutional analysis proceeds as if *Boumediene* were never decided. *Boumediene* specifically noted that the Court has always left open the possibility that the Suspension Clause protects post-1789 expansions of habeas procedures. 128 S. Ct. at 2248. *Boumediene* also rejected the Government's suggestion (Br. 21) that *Felker v. Turpin*, 518 U.S. 651 (1996), somehow showed that post-1789 expansions were not protected. *Boumediene*, 128 S. Ct. at 2264. Accordingly, the Suspension Clause may well protect some right to discovery in habeas, particularly where there has not been any prior fair trial. The Court need not decide this issue, however, as the habeas statute clearly authorizes discovery in these cases.

[9] Petitioners' need for certain discovery—and, for that matter, the scope of an evidentiary hearing—could be obviated by stipulations to particular facts. For example, the *Boumediene* Petitioners asked the Government to stipulate to certain facts pertaining to the circumstances of the Petitioners' arrest in Bosnia, in an effort to minimize potential discovery. *See* Declaration of Robert C. Kirsch ¶ 8, Exhibit C. Yesterday, the Government informed counsel that it would not stipulate to such facts, although its basis for denying them remains unclear. *Id.* ¶ 9, Exhibit D.

"rubble") and then emphasizing the dangers such demands would pose. Gov't Br. 25, 28-29.

Contrary to the Government's assertions, however, Petitioners have no interest in directing the

Government on a "fishing expedition." Gov't Br. 25. Petitioners seek only the process to which

the Supreme Court has said they are entitled: a meaningful proceeding in which they can fairly

test the Government's bases for detention. *Boumediene*, 128 S. Ct. at 2266-67. To that end,

Petitioners must be provided with information in the Government's possession that could

undermine the Government's assertions. *See Harris*, 394 U.S. at 300 (where development of

certain facts would allow the petitioner to demonstrate the illegality of his detention, "it is the

duty of the court to provide the necessary facilities and procedures for an adequate inquiry").

The Government's voluntary undertaking to provide to Petitioners some exculpatory

information that its attorneys happen to "encounter" (Br. 4) implicitly acknowledges that

production of exculpatory information in the Government's possession is necessary to preserve

fairness. However, the Government balks at the added responsibility of *looking* for exculpatory

information that it does not happen to "encounter" on its own.The Government's self-serving

limitation is not supported by the law and exaggerates any actual burden that Petitioners'

proposal might impose.

As the Government acknowledges, a requirement that the Government produce

exculpatory evidence is grounded in "strictures against misrepresentation." *Kyles v. Whitely*, 514

U.S. 419, 432 (1995) (*quoted in* Gov't Br. 24). The Government has no more right to benefit

from misrepresentation and concealment of information in these cases than in the criminal

context. *See, e.g.*, *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("Society wins not only when the

guilty are convicted but when criminal trials are fair; our system of the administration of justice

suffers when any accused is treated unfairly.").

Petitioners in these cases are even *more* dependent on information in the Government's possession than the typical criminal defendant. While permitting itself over six years to build its factual allegations against Petitioners, the Government has systematically deprived Petitioners of meaningful opportunities to obtain or preserve evidence that could now be used in their defense. Notably, the Government has confiscated the personal items (including identification and passports) that Petitioners had in their possession upon arrival at Guantanamo, has never made them available to counsel, and in some cases has not even acknowledged that it possesses such documents. Requiring the Government to locate and produce potentially exculpatory evidence is necessary to ensure an "adequate inquiry" into the legality of the detentions at issue. *Harris*, 394 U.S. at 300. No less than in the criminal context, permitting the Government to withhold exculpatory evidence would place the Executive "in the role of an architect of a proceeding that does not comport with standards of justice." *Brady*, 373 U.S. at 88; *see also Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc) ("Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned.").

The Government's suggestion that disclosure of exculpatory evidence should be eliminated in the name of "expedited consideration" (Br. 29) cannot be taken seriously. The Government has steadfastly resisted any meaningful merits proceeding in these cases for over six years. Now that the Supreme Court has definitively rejected its delaying tactics, the Government cannot invoke expedition to demand that Petitioners proceed to trial on a newly-disclosed factual return while the Government withholds contrary evidence favorable to Petitioners. Petitioners have the utmost interest in promptness, but the Court should not pursue speedy process at the expense of accuracy and fairness.

Finally, the Government has made no showing that compliance with a disclosure obligation would impose an undue burden on the Government in any actual case.  The Government's own "regulations" required it to preserve the so-called "Government Information"—defined as all "'reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant'" (Pet. Opening Mem. 33 (quoting *Bismullah v. Gates*, 501 F.3d 178, 181 (D.C. Cir. 2007))—in order that it could be shown to officials involved in the Combatant Status Review Tribunal process.  *See* Memorandum from Gordon England, Secretary of the Navy Re Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants detained at Guantanamo Bay Naval Base, Cuba, Encl. 1, ¶ G(4), July 9, 2004 (excerpt attached as Exhibit E) (noting that the Personal Representative completes a Detainee Election Form "after the detainee's Personal Representative has reviewed the Government Information").  The Government may well believe that the D.C. Circuit erred in requiring production of the full "Government Information" under the Detainee Treatment Act (*see Bismullah v. Gates*, 503 F.3d 137 (D.C. Cir. 2007)), but Petitioners are not seeking *production* of that information in the first instance.  Rather, Petitioners seek only that the Government *review* it and produce any exculpatory information contained therein.  This task should hardly be characterized as a burden, given the Government's statutory and regulatory obligation to preserve and review that body of evidence.

Although Petitioners welcome the Government's undertaking to provide exculpatory evidence "which the attorneys preparing the factual return encounter in developing the return" (Gov't Br. 4), it is hardly sufficient.  The Government does not explain what its "attorneys"—as opposed to other Government officials—will be reviewing in preparing the returns or what it

means for those attorneys to "encounter" information.  There is a significant concern that the Government will turn a blind eye to information that could play a critical role in any fair determination of the legality of imprisonment—just as the CSRTs did when they failed to consider evidence easily accessible to the Government.[10]

Indeed, the Government's recent behavior confirms that it is deliberately refusing to review documents that likely contain exculpatory evidence, even when specifically directed to such documents.  For example, the *Boumediene* Petitioners have provided the Government with a detailed index, prepared by the Government itself in another case, listing pertinent materials regarding the *Boumediene* Petitioners that the Government has assembled and bates-labeled.  Declaration of Robert C. Kirsch ¶ 4, Exhibit A. Counsel has asked the Government to confirm that its attorneys will review these documents, *which the Government has already gathered and numbered*, and produce any exculpatory evidence encountered therein pursuant to its undertaking.  *See id.* ¶ 4,  Exhibit B.  Yet the Government has so far refused to confirm that it will even review those materials, let alone that it will provide exculpatory material they contain, even though its attorneys are now clearly on notice of their existence and location.  The Government's refusal to review specifically identified documents in its possession demonstrates the emptiness of its undertaking and the need for this Court to order the Government to locate and produce exculpatory evidence.

---

[10] For example, in connection with his CSRT, Petitioner Saber Lahmar in *Boumediene* (No. 04-CV-1166) requested evidence in the form of a document the CSRT identified as "Bosnian government document finding detainee not guilty of attempting to bomb the U.S. Embassy."  The Tribunal President determined the document was "not reasonably available." However, those Bosnian court documents were appended as exhibits to Lahmar's habeas petition and multiple other filings served on the Government prior to Lahmar's CSRT.  Pet. for Writ of Habeas Corpus, *Boumediene*, No. 04-CV-1166 (July 12, 2004).

C.    **The Court Should Uphold Petitioners' Ability To Confront The Evidence Against Them, Including Through An Evidentiary Hearing**

1.    **The Court should hold an evidentiary hearing to resolve disputes of fact**

After much qualification and citation to numerous cases from the post-conviction criminal context, the Government ultimately concedes that substantial factual disputes between Petitioners and the Government should be the subject of evidentiary hearings with live testimony.  Gov't Br. 35.  Petitioners are in full agreement with this proposition and have never argued that a hearing is required in all cases.  The Government proposes, however, that hearings should be permitted only after written submissions (including, apparently, another round of pre-hearing briefing) and only after a presumption of the validity of the Government's evidence has been overcome to the extent that "the weight of the evidence supports the habeas petitioner."  *Id.* 34.  The Government appears to believe that a hearing should only be held to shore up the *Government's* position.  The Government's structure rests on its claimed presumption of validity and its effort to place the ultimate burden of persuasion on the Petitioner, both of which are erroneous as discussed above.  The Government has provided no authority for its cramped view of evidentiary hearings in the Executive detention context.  Rather, in cases where factual issues remain in dispute, an evidentiary hearing is both the most fair and speediest way to resolve those issues.

Contrary to the Government's claim (Br. 33-34), neither *Boumediene* nor *Hamdi* held that hearings were exceptional in this context.  On the contrary, both cases recognized the importance of a hearing.  *See Boumediene*, 128 S. Ct. at 2275 ("[t]he detainees in these cases are entitled to a prompt habeas corpus hearing"); *Hamdi*, 542 U.S. at 533 (plurality opinion) ("'An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case."'" (quoting *Cleveland Bd. of*

*Educ. v. Loudermill*, 470 U.S. 532, 542 (1985))). *Boumediene*'s holding that a habeas court must possess "sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain" (*id.* at 2269) certainly includes the opportunity for a live hearing to resolve disputes of material fact. The Government's claim that evidentiary hearings did not occur in habeas proceedings "in 1789 or for decades thereafter" (Br. 32) is both irrelevant (as discussed in Part I.A above) and incorrect; several habeas courts in both the United States and in England heard live testimony from petitioners and other witnesses.[11]

The Government's main argument against evidentiary hearings is that "soldiers must [not] be distracted from 'the serious work of waging battle' to provide eyewitness accounts of actions that occurred half a world away." Gov't Br. 34 (quoting *Hamdi*, 542 U.S. at 531-32); *see also id.* at 35, 39. This objection is decidedly premature, since no Petitioner has yet sought testimony from any "soldier." Given the remoteness of most Petitioners from any actual "battle," the situation may never arise in these cases. As this Court knows, the Government has cautioned the Court during recent chambers conferences against acting on "hypotheticals" and "abstract comments," urging the Court to defer decision until it knew the facts—there the facts of

---

[11] *E.g.*, *Delaware v. Clark*, 2 Del. Cas. 578 (Del. Ch. 1820) (discharging petitioner based on affidavits and live testimony from third parties proving that petitioner had enlisted while intoxicated and without his father's authority); *Wilson v. Izard*, 30 F. Cas. 131, 131 (C.C.N.Y. 1815) (reviewing claim that petitioners were exempt from impressment as "alien enemies," which was "a fact not appearing on the return, but sworn to at the time of the allowance of the habeas corpus"); *R. v. Turlington*, 97 Eng. Rep. 741 (K.B. 1761) (discharging woman from custody after reviewing doctor's affidavit and conducting examination of petitioner's mental condition); *R. v. Lee*, 83 Eng. Rep. 482 (K.B. 1676) (considering petitioner's testimony on "oath in court" that "she went in danger of her life by [her husband]" and should be freed from his custody).

the Government's amended return.  The Government's caution was well founded; and here, its extreme hypotheticals cannot justify the denial of a hearing.[12]

Moreover, the onerous preconditions that the Government would place on an evidentiary hearing (Br. 34-35) rest on its fundamental misunderstanding of the burden of proof.  *See supra* at 9-10.  Because Petitioners have not previously received fair process, the Government is not entitled to any presumption of validity, much less to require that Petitioners' evidence appear *on paper* to be "more persuasive" than the Government's evidence.  Rather, an evidentiary hearing should be held whenever the written submissions disclose a dispute of material fact that must be resolved by assessing the relative credibility and reliability of the parties' witnesses.  *See Stewart v. Overholser*, 186 F.2d 339, 342 (D.C. Cir. 1950) ("When a factual issue is at the core of a detention challenged by an application for the writ it ordinarily must be resolved by the hearing process.  This is a chief purpose of the habeas corpus procedure.").

### 2. The "fundamental procedural protections" of habeas corpus include a basic right to confrontation and compulsory process

The Government argues that Petitioners have no rights to confrontation and compulsory process because there is no "constitutional provision" that applies in the context of habeas cases brought by "aliens captured and held abroad as enemy combatants."  Gov't Br. 36.  Leaving aside the Government's disregard of the Supreme Court's holding that Guantanamo "is not abroad" (*Boumediene*, 128 S. Ct. at 2261), the Government's focus on a "constitutional"

---

[12] In urging the rarity of evidentiary hearings on habeas, the Government cites cases from the *post-conviction* context, where habeas petitions follow a jury trial and direct appeal.  *See* Gov't Br. 34-35 (citing *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007); *Harris v. Nelson*, 394 U.S. 286 (1969); *Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999); *Tijerina v. Thornburgh*, 884 F.2d 861, 866 (5th Cir. 1989)).  Such cases provide no guidance for these habeas cases, which challenge the lawfulness of executive detention where no neutral factfinder has heard the facts of the petitioner's case.  *See Boumediene*, 128 S. Ct. at 2264 (postconviction review cases "give little helpful instruction (save perhaps by contrast) for the instant cases, where no trial has been held").

foundation is again a red herring, since confrontation rights inhere in the statutory framework of habeas corpus and the "fundamental procedural protections" to which *Boumediene* held that Petitioners were entitled. *Id.* at 2277. While not every hearing may require the presence of Government witnesses, accurate fact-finding regarding the allegations in particular cases may well require the presence (actual or videographic) of such witnesses in order to conduct probing examinations and to make credibility determinations. This is a matter best deferred until the Government has filed its factual returns and concrete requests for live testimony have been propounded.

Live testimony from the prisoner may also be indispensable, especially where the petitioner himself may be best (and perhaps uniquely) able to rebut the allegations made against him. As the Government acknowledges, "[w]here … there are substantial issues of fact as to events in which the prisoner participated, the trial court should require his production for a hearing." *United States v. Hayman*, 342 U.S. 205, 223 (1952) (*quoted in* Gov't Br. 37). The Government's attempt to distinguish *Hayman* fails because, like *Hayman*, these cases arise under the habeas statute, not "the traditional, eighteenth-century practice enshrined in the Suspension Clause." Gov't Br. 38.[13]

---

[13] The Government makes much of the fact that the prisoner in *Hayman* was already in the United States. *See* Gov't Br. at 38. Regardless of whether the Court may order an alien's "admission" into the United States, the Department of Homeland Security is specifically authorized to *parole* into the United States "[a]liens who will be witnesses in proceedings being, or to be, conducted by judicial … bodies in the United States." 8 C.F.R. § 212.5(b)(4). Under federal immigration law, the "parole of such alien shall not be regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5)(A); *see also Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2007) (noting the "well-settled principle that parole does not effect a legal entry or admission to the United States"). In an appropriate case, this Court should request that the Secretary of the Department of Homeland Security parole a prisoner into the United States for the limited purpose of testifying at a hearing.

### 3.    The government's hearsay evidence must be carefully vetted for reliability

The Government argues that not only should hearsay be admitted, but that it should be "the norm, not the exception," and that this principle is "establish[ed]" by *Hamdi*.  Gov't Br. 38-39.  As previously shown, the *Hamdi* plurality established no hard and fast rules, but only guidelines for what may be appropriate depending on the circumstances.  *See supra* at 4-7.  While Petitioners acknowledge that hearsay may be required in some situations, that eventuality does not excuse the Government from establishing both the source and the reliability of its information with as much specificity as possible.

In reviewing an enemy combatant determination by a CSRT, the D.C. Circuit held that "hearsay evidence … must be presented in a form, or with sufficient additional information, that permits the Tribunal and court to assess its reliability."  *Parhat*, 2008 WL 2576977, at *13. In fact, the Court of Appeals deemed much of the hearsay evidence put forward by the Government to be of unknown reliability and therefore insufficient to support detention as an "enemy combatant."  For example, intelligence documents asserting relationships between an organization with which the prisoner was allegedly affiliated and Al Qaeda and the Taliban,

> repeatedly describe those activities and relationships as having "reportedly" occurred, as being "said to" or  "reported to" have happened, and as things that "may" be true or are "suspected of" having taken place.  But in virtually every instance, the documents do not say who "reported" or "said" or "suspected" those things.  Nor do they provide any of the underlying reporting upon which the documents' bottom-line assertions are founded, nor any assessment of the reliability of that reporting.  Because of those omissions, the Tribunal could not and this court cannot assess the reliability of the assertions in the documents.

*Id.* at *11 (footnote omitted).  If hearsay is permitted, the Government must provide some indication of the source of the information so that the Court may make a determination of reliability.  Without it, the Government's claim of reliability amounts to no more than a bare

assertion, which, as the D.C. Circuit recognized, "comes perilously close to suggesting that whatever the government says must be treated as true." *Id.* at *13.

Given the concerns expressed in *Parhat*, and the strong likelihood that the Government will proffer equally unsourced evidence in these proceedings, it makes little sense to accord the Government any presumption in favor of its evidence. Quite the contrary: the Court should apply a healthy dose of skepticism in assessing the "weight" to be given to the Government's hearsay. *See Al-Marri*, 2008 WL 2736787, at *47 (Traxler, J., concurring in the judgment) (rejecting hearsay where the Government "made no attempt to show that this hearsay evidence 'need[s] to be accepted as the most reliable available evidence from the [g]overnment'" (quoting *Hamdi*, 542 U.S. at 533-534 (plurality opinion))). An evidentiary hearing where witnesses may be confronted and cross-examined is a critical mechanism in this regard.

### D. Upon The Request Of A Petitioner, The Court Should Enter An Interim Order Requiring The Government To Give Thirty Days' Notice Of Any Planned Transfer From Guantanamo

The Government misunderstands the request for advance notice of intent to transfer. Petitioners do not request the Court to enjoin a transfer now. Petitioners simply ask the Government to notify the Court and Petitioners' counsel in advance of a planned transfer. Moreover, advance notice would allow this Court to manage its calendar without the concern of last minute changes. Accordingly, this Court need not consider the jurisdictional questions the Government poses at this time. Those matters can be broached if and when a Petitioner actually seeks to enjoin a planned transfer or, for that matter, after the decision issues in *Kiyemba v. Bush*, No. 05-5487 (D.C. Cir.), scheduled for argument on September 25. Petitioners' instant request for notice serves only to preserve the status quo.

1.    **The Government's arguments regarding § 2241(e)(2) are irrelevant and incorrect**

Contrary to the Government's arguments, neither Petitioners' request for notice nor any eventual request to enjoin transfer would be subject to 28 U.S.C. § 2241(e)(2). That subsection applies only to "other action[s]," a phrase that the Supreme Court held "cannot be understood without referring back to the paragraph that precedes it, § 2241(e)(1), which explicitly mentions the term 'writ of habeas corpus.'" *Boumediene*, 128 S. Ct. at 2243. Accordingly, subsection (e)(2) has no application in habeas actions such as these, over which the Court plainly has jurisdiction under *Boumediene*. A request for notice, and any later request for transfer, is a means for this Court to protect its existing habeas jurisdiction. *See Adams v. United States*, 317 U.S. 269, 273 (1942) (the All Writs Act empowers this Court to issue orders necessary to protect its jurisdiction and "to achieve the ends of justice entrusted to it"). A request for a preliminary injunction under Federal Rule of Civil Procedure 65 would likewise protect the Court's existing habeas jurisdiction under section 2241(c); it would not begin a new "action."

*Boumediene* nowhere suggests that Congress could enact, or had enacted, any provision that forbade this Court from affording complete relief under habeas, which necessarily includes the Court's power to protect its own habeas jurisdiction by averting mootness. To the extent that section 2241(e)(2) could be interpreted to forbid a court from protecting its habeas jurisdiction— and as discussed above it cannot, since a habeas action is by definition not an "other action" (*Boumediene*, 128 S. Ct. at 2243)—then subsection (e)(2) must be deemed invalid as well.[14]

---

[14] As the Government acknowledges, *Boumediene* referred to section 2241(e) without differentiating among the subsections. *See id.* at 2275 ("The only law we identify as unconstitutional is MCA § 7, 28 U.S.C.A. § 2241(e) (Supp. 2007)").

### 2.     The Government's reliance on *Munaf* is misplaced

Alternatively, the Government relies on *Munaf v. Geren*, 128 S. Ct. 2207 (2008), in support of their objection to any advanced notice of transfer.  The Government asks too much of *Munaf*.  The  factual circumstances in *Munaf*, which were "essential to the Court's holding," were unique and distinct from those in the cases before this Court.  *Id.* at 2228 (Souter, J., concurring).  In *Munaf*, the petitioners had voluntarily traveled to the country where they were being detained; the government of that country decided to prosecute them for crimes committed there; and any transfer would be to the custody of an authority that the U.S. State Department had determined "generally met internationally accepted standards for basic prisoner needs."  *Id.* at 2226; *see also id.* at 2228 (Souter, J., concurring) (outlining the eight critical and unique factual circumstances in the case).  A case involving individuals who commit crimes *within a foreign country's territory*, who therefore may be transferred to that country's government for prosecution, is fundamentally different from a case of individuals held without charge in U.S. custody who have not been accused of any crime in the proposed country of transfer.

Unlike the petitioners in *Munaf*, Petitioners here do not know if, when, or where they will be transferred or for what purpose.  Unlike the petitioners in *Munaf*, *see* 128 S. Ct. at 2227-28, Petitioners here do not concede that any yet-to-be determined place of transfer has a sovereign right to prosecute them for any crime.  Moreover, without any evidence that Petitioners committed a crime in a yet-to-be determined place of transfer or that any such country intends to prosecute them for crimes, it is impossible to perform the *Munaf* analysis.  Indeed, the Court could only determine whether *Munaf* applied to a given case if it had advance notice of a transfer and information regarding the destination country, which is precisely what Petitioners seek.

The Government also relies heavily on the statement in *Munaf* that "it is for the political branches, not the judiciary, to assess practices in foreign countries" with respect to determining

whether transfer is appropriate.  128 S. Ct. at 2225.  Broad interpretation of this statement is

unwarranted.  *See id.* at 2213 ("Under circumstances *such as those presented here*, … habeas

corpus provides petitioners with no relief." (emphasis added)).  This general premise—which is

at most federal common law—is trumped by the statutory obligation to examine whether

someone will be tortured upon transfer.  *See* Foreign Affairs Reform and Restructuring Act of

1998 (FARRA), Pub. L. No. 105-277, Div. G, tit. XXII, § 2242(a), 112 Stat. 2681-761, 2681-822

(codified as a note to 8 U.S.C. § 1231) (prohibiting transfers where there are substantial grounds

for believing torture will occur).[15]  Indeed, the Government's interpretation of *Munaf* is at odds

with the numerous judicial determinations that an alien may not be deported to a country where

he would likely face persecution.  *See, e.g.*, *Sok v. Mukasey*, 526 F.3d 48, 54-56 (1st Cir. 2008)

(finding that the Immigration Judge erred in concluding that the petitioner was not likely to face

persecution if sent back to Cambodia and therefore remanding to the agency for further

proceedings).

     Equally important, *Munaf* did not categorically prohibit injunctions against transfer; it

expressly reserved judgment on the "extreme case in which the Executive has determined that a

detainee [in United States custody] is likely to be tortured but decides to transfer him anyway."

*Id.* at 2226; *see also id.* at 2228  (Souter, J., concurring) ("extend[ing] the caveat to a case in

which the probability of torture is well documented, even if the Executive fails to acknowledge

it").  If the Government were not required to give notice of where and under what conditions it

---

[15] FARRA is enforceable in habeas.  FARRA establishes a statutory prohibition against transfer of a person to a country in which there are "substantial grounds" for believing someone will be tortured.  FARRA, § 2242(a).  The writ of habeas corpus extends to claims that a person is in custody in violation of the laws of the United States.  28 U.S.C. § 2241(c)(3).  A person in custody of the United States may therefore challenge his detention and related transfer in violation of FARRA just as he would the violation of any other statute.  *See Saint Fort v. Ashcroft*, 329 F.3d 191, 202 (1st Cir. 2003) ("FARRA and the regulations are now the positive law of the United States, and, as such, are cognizable under habeas.").

intended to transfer Petitioners, and if jurisdiction is lost upon transfer, then such relief could never be realized, no matter how extreme the Government's conduct. The *Munaf* Court was not presented with and did not decide whether the United States can transfer a petitioner to a place where torture is a realistic possibility. Nor did it address the relief sought here—mere notice.

### E. Cases Should Be Adjudicated Promptly Whenever A Prisoner Is In Custody, Regardless Of Whether The Government Has "Cleared" Him

The Court should not give lower priority to cases where the Petitioner has been approved for release or transfer by a Government Administrative Review Board (ARB). In the unlikely event that these cases do not naturally fall into sequence, the Court should give priority to prisoners who have been in U.S. custody for the longest time. Indeed, the Government itself has proposed a similar sequencing scheme before Judge Hogan, where it suggested sequencing cases by when an individual arrived at Guantanamo or, with some exceptions, by when cases were docketed. Letter from Gregory G. Katsas to Chief Judge Lamberth and Judge Hogan, June 30, 2008, at 3 (attached as Exhibit F).

The Government notably does not dispute that ARB clearance bears no apparent relation to likelihood of transfer from Guantanamo.[16] The declarations the Government provides are not to the contrary: they state only that detainees "have been transferred" or "may be transferred" after ARB clearance. Hodgkinson Decl. ¶ 3; Williamson Decl. ¶ 3. The declarations do not deny that non-cleared detainees have also been transferred from Guantanamo, and they do not suggest that cleared Petitioners are more likely to be transferred quickly than non-cleared detainees. Accordingly, even the Government's own evidence fails to support the claim in its

---

[16] The Director of the office responsible for ARBs admitted that it was "incorrect" to suggest that ARB determinations were the "most important factor" in a prisoner's transfer. Farah Stockman, *Some Cleared Guantanamo Inmates Stay in Custody*, Boston Globe, Nov. 19, 2007, *available at* http://www.boston.com/news/nation/articles/2007/11/19/some_cleared_guantanamo_inmates_stay_in_custody/.

brief (at 48) that there is a "realistic chance" that ARB-cleared Petitioners' cases will become

moot, and the Government's own historical practice refutes it entirely.

The Government's bald assertion that it is "actively seeking to release or transfer

[cleared] petitioners" (Br. 48) is likewise utterly unsupported.  The Government's declarations

nowhere suggest that resettlement efforts are being made—"actively" or otherwise—on behalf of

all cleared prisoners.  The declarations do not indicate when the Government starts the process of

negotiating transfer, do not indicate whether the Government is actually taking all available steps

to transfer the cleared Petitioners before this Court, and do not even state that the Government

*wishes* to transfer these cleared Petitioners quickly.  On the contrary, as Petitioners showed, the

Government's attempts to negotiate transfer have been decidedly slow.  *See* Pet. Opening Mem.

15 (demonstrating that the Yemeni Ministry of Foreign Affairs had yet to be notified of a

Yemeni Petitioner's clearance months after it occurred, and that a cleared Algerian Petitioner has

not been transferred despite the recent transfer of two Algerian detainees—one who, to counsel's

knowledge, was not ARB-cleared).  An order for release would spur the Government to take

action and impose accountability, rather than leaving transfer of cleared prisoners to the

Government's whim.[17]

An order for release from this Court would be of great practical significance, despite the

Government's arguments to the contrary.  As a preliminary matter, all ARB-cleared Petitioners

before this Court have been "cleared for transfer," where the Government nonetheless requires

---

[17] The Government's reliance on *Al-Anazi v. Bush*, 370 F. Supp. 2d 188 (D.D.C. 2005) is accordingly misplaced.  *Al-Anazi* did not even consider, let alone hold, that ARB-cleared persons did not need prompt habeas hearings.  Moreover, *Al-Anazi* proceeded on the assumption that the Government was "taking steps to transfer [the petitioners] out of United States control." *Id.* at 196.  Here, however, Petitioners have shown strong evidence that ARB clearance is irrelevant to transfer and does not lead to prompt steps to secure release, and the Government has provided no evidence to the contrary.  Accordingly, *Al-Anazi* provides no basis for delaying resolution of any case before this Court.

the Petitioners continued detention in the receiving country.[18] As habeas relief is about the legality of continued detention, a habeas court's decision to order the release of a "cleared for transfer" Petitioner would affect the Government's course of action with respect to that "cleared for transfer" Petitioner in at least one significant regard—the Government would not seek continued detention as a condition for transfer.  Therefore, a habeas court's release order would accelerate the repatriation of "cleared for transfer" Petitioners.  An order for release for any Petitioner would compel the Government to pursue all available avenues for release, including lessening conditions placed on receiving countries, seeking release in a third country, or arranging for release into the United States.

Finally, Petitioners do not seek disclosure of sensitive or confidential information related to negotiations with foreign governments.  Periodic reporting on why cleared detainees remain detained is appropriate, but such reporting would not require the release of sensitive information.

---

[18] "Cleared for transfer" status is distinct from "cleared for release" status.  The government does not seek continued detention in the receiving country as a condition of release from Guantanamo for those detainees who are "cleared for release."

Respectfully submitted,

/s/ Richard A. Grigg
Richard A. Grigg
Spivey & Grigg
48 East Avenue
Austin, TX 78701
(512) 474-6061

*Counsel for Petitioner Obaydullah in No. 08-1173*

/s/ Ramzi Kassem
Ramzi Kassem
Michael J. Wishnie
  *Supervising Attorneys*
Jennifer Hojaiban
Brian K. Mahanna
Joseph A. Pace
  *Law Student Interns*
Allard K. Lowenstein International Human
Rights Clinic
National Litigation Project
Yale Law School
127 Wall Street
New Haven, CT 06511
(203) 432-0138

*Counsel for Petitioner Ameur in No. 05-573*

/s/ Billy H. Nolas
Billy H. Nolas, Assistant Federal Defender
(*admitted*)
Maureen Rowley, Chief Federal Defender
Matthew Lawry
Shawn Nolan
Mark Wilson
Brett Sweitzer
Assistant Federal Defenders
Federal Community Defender Office for
The Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
 (215) 928-0520
*Counsel for Petitioner Rumi in No. 06-619*

 /s/ Allyson J. Portney
Stephen H. Oleskey (*admitted pro hac vice*)
Robert C. Kirsch (*admitted pro hac vice*)
Mark C. Fleming (*admitted pro hac vice*)
Gregory P. Teran (*admitted pro hac vice*)
Allyson J. Portney (*admitted pro hac vice* )
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
 Boston, MA  02109
(617) 526-6000

Seth P. Waxman (*admitted*)
Paul Wolfson *(admitted)*
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6800

Douglas F. Curtis *(admitted)*
Paul M. Winke (*admitted pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY  10022
(212) 230-8800

*Counsel for Petitioners Boumediene, et al.,*
*in No. 04-1166*

/s/ Julia C. Symon
Julia C. Symon (DC Bar No. 456828)
Clifford Chance US LLP
2001 K Street NW
Washington, DC  20006
(202) 912-5000

James M. Hosking
Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019
(212) 878-8000

*Counsel for Petitioners Ghazy, et al. in No.*
*05-2223*

/s/ Stephen R. Sady
Stephen R. Sady
Chief Deputy Federal Public Defender
101 SW Main Street  Suite 1700
Portland, Oregon  97204
503-326-2123

*Counsel for Petitioner Al Ginco in No. 05-1310*

/s/ Shereen J. Charlick
Shereen J. Charlick
Steven F. Hubachek
Ellis M. Johnston, III
Stephen D. Demik
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California  92101-5008
(619) 234-8467

*Counsel for Petitioner Al Bihani in No. 05-1312*

August 19, 2008

/s/ Zachary Katzenlson
Zachary Katzenlson
Reprieve
PO Box 52742
London EC4P 4WS
United Kingdom
011 44 207 353 4640

*Counsel for Petitioners  Sliti et al. in No. 05-429 and Petitioner Al Shurafa in Kabir in No. 05-0431*

/s/ Brian Mendelsohn
Brian Mendelsohn (Pursuant to LcvR 83.2)
Matthew Dodge
Federal Defender Program, Inc.
Suite 1700, The Equitable Building
100 Peachtree Street, N.W.
Atlanta, Georgia  30303
(404) 688-7530

*Counsel for Petitioner Al-Khaiy in No. 05-1239*

## CERTIFICATE OF SERVICE

I, Allyson J Portney, hereby certify that on August 19, 2008 I electronically filed and

served the foregoing PETITIONERS' JOINT REPLY MEMORANDUM REGARDING

HABEAS PROCEDURES.


/s/ Allyson Portney_____
Allyson Portney